IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2001 Session

## PAUL G. SUMMERS, ET AL. v. CHEROKEE CHILDREN & FAMILY SERVICES, INC., ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 00-2988-I     Irvin Kilcrease, Jr., Chancellor**

_____

**No. M2001-00880-COA-R3-CV - Filed September 26, 2002**

_____

In this appeal, the Attorney General filed suit to dissolve two nonprofit public benefit corporations. Both the Attorney General and the nonprofit corporations filed motions for summary judgment. The trial court granted summary judgment for the Attorney General finding that the nonprofit corporations had abandoned their charitable purposes and devoted themselves to private purposes. The trial court ordered the appointment of a receiver to marshal and preserve the remaining assets. For the following reasons, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Allan J. Wade, Thomas Lang Wiseman, and Lori Hackleman Patterson, Memphis, Tennessee, for the appellants, Cherokee Children and Family Services, Inc., and Cherokee Children Nutrition, Inc.

Paul G. Summers, Attorney General and Reporter; Albert L. Partee, Senior Counsel; George S. Bell, III, Assistant Attorney General; Michael A. Meyer, Assistant Attorney General, for the appellee, the Attorney General of Tennessee.

**OPINION**

This is a case of first impression in this State wherein the Attorney General sought to involuntarily dissolve Cherokee Children and Family Services, Inc. ("CCFS") and Cherokee Children Nutrition, Inc. ("CCN") via the authority granted in Tenn. Code Ann. § 48-64-301(a)(1). CCFS and CCN are two related nonprofit public benefit corporations that are tax-exempt under state and federal law. The Attorney General sought appointment of a receiver to marshal the remaining nonprofit assets, dissolve the corporations, and distribute the assets to other "legitimate" nonprofit organizations. He alleged that CCFS and CCN had repeatedly violated the Tennessee Nonprofit Corporation Act and specifically questioned numerous transactions, including: (1) rental of property

owned by the executive director to the corporations; (2) hiring of the executive director's husband as accountant for the corporation; (3) investment of CCFS monies in a local start up bank; and (4) several transactions and purchases by the corporation for the benefit of the executive director, her family, and friends.

A hearing was held in Davidson County Chancery Court regarding a motion for temporary injunction and appointment of a custodian *pendente lite* filed by the Attorney General. The trial court entered a temporary injunction requiring CCFS and CCN to grant access to their records by the Attorney General, to protect and preserve all books and records, and to adhere to a $50,000 a month budget for six months. The trial court declined to appoint a custodian *pendente lite* at that time. Both parties then filed motions for summary judgment.

Six months later, the trial court heard oral argument on both motions for summary judgment. The Chancellor granted the Attorney General's motion for summary judgment and made the following findings:

1. that the Attorney General is entitled to a receiver for defendants and is entitled to proceed with dissolution;
2. that the Defendants have abandoned their public purposes and have devoted themselves to private purposes;
3. that this is not in keeping with the Tennessee Nonprofit Act;
4. that the Attorney General has the authority to take action under his statutory supervisory power over nonprofits and as a representative of the public interest; and
5. that there is an immediate need for the Attorney General to take over the assets of the defendants; . . . .

The trial court appointed a receiver and enumerated his duties and responsibilities as well as the scope of his authority under Tenn. Code Ann. § 48-64-303.[1]

CCFS and CCN appeal arguing that the trial court improperly granted summary judgment in favor of the Attorney General and improperly denied their own motion for summary judgment.

---

[1]The trial court denied CCFS's and CCN's motion for stay pending appeal, ruling that a stay would "interfere with the Attorney General's right to carry out his duties." The corporations sought a stay from this court, which was denied. Thus, the assets have remained under the protection of the receiver.

## I. Background

WillieAnn Madison[2] incorporated CCFS as a nonprofit public benefit corporation in December of 1989 under the auspices of the Tennessee Nonprofit Corporation Act, Tenn. Code Ann. §§ 48-51-101 *et seq.* According to a charter amendment made April 19, 1990, the purposes of the corporation were:[3]

> . . . to provide transitional child care services for children of low-income families referred by the Department of Human Services. Funds for this project are provided by Federal and State block grants which are used for tuition payments and administrative expenses.

> The services provided by CCFS include listing and classification of child care providers, referrals of qualified families to appropriate child care centers, and the monitoring and supervision of each placement under guidelines provided by DHS. Upon the dissolution of CCFS, all remaining assets will be returned to the Federal and State offices which supplied the original grants.[4]

CCFS had no members. According to the charter, as amended, CCFS was intended to operate as a charitable organization within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986. In fact, the amended charter included the following in its statement of purposes:

> . . . exclusively religious, charitable, scientific, literary, and educational within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue law.

> Notwithstanding any other provision of these articles, this organization shall not carry on any activities not permitted to be carried on by an organization exempt from

---

[2] At that time, Mrs. Madison was WillieAnn Daugherty.

[3] The purposes set forth in the original charter were:

(a) To provide comprehensive social service for young people from infancy through nineteen (19) years of age who are teenage mothers, handicap children, under-achievers in school and special-problem children.

(b) To mobilize and utilize resources, both public and private; to offer continuous and progressively comprehensive social services appropriate to our target group or clientele.

(c) To do anything necessary and proper for the accomplishment of the foregoing purpose and goals, provided same is not inconsistent with the laws of the State of Tennessee and the United States of America.

[4] According to CCFS, many of the organizers of CCFS were early childhood educators or child care providers and, consequently, there had always been an emphasis on helping parents to obtain child care services, and the charter was amended to reflect this purpose.

Federal income tax under section 501(c)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue law.

On or about June 18, 1990, CCFS filed an application for exemption under 501(c)(3) of the Internal Revenue Code. The IRS approved the application for tax exempt status. In the application, CCFS represented that neither Mrs. Madison, William Davis (Mrs. Madison's father) nor any other individual listed as an officer or director[5] were disqualified persons[6] with respect to the organization. CCFS represented that its facilities or operations would not be managed by another organization or individual under a contractual agreement and that the organization was not a party to leases. CCFS asserts that these statements were true at the time they were made, but could have changed thereafter.

CCFS entered into a contract with the Tennessee Department of Human Services ("DHS") to provide childcare brokerage services to low income families in Shelby County in 1990. CCFS also contracted with DHS to provide meal and related administrative services under the Child and Adult Care Food Program ("CACFP") and certain other services for underprivileged children. CCFS began providing registration and transportation services under contracts with DHS in 1998. CCFS continued to work pursuant to contracts with DHS until the contracts were terminated in 2000.

On November 2, 1998, CCN was incorporated as a public benefit corporation. CCN was organized to handle certain portions of the food program for which CCFS was responsible in accordance with contracts between CCFS and DHS. On the initial corporate paperwork filed with the Secretary of State, WillieAnn Madison was listed as the incorporator.[7] The Charter filed with the Secretary of State was a fill-in-the-blank form and did not indicate the purpose. However, in its application for tax exempt status, CCN attached the following, entitled, Charter, Part III Activities and Operational Information:

> The Cherokee Children Nutrition (CCN) will be chartered by the State of Tennessee. Its mission is to serve minority children, infants to age seventeen, in ways that are educational, nutritional, healthful, and with social [sic] social services. The target area is the City of Memphis, Tennessee within the County of Shelby.
>
> A. CCN will provide brokering services to all know [sic] area child care providers. CCN will work with clients to enable them to identify accessible, safe and sanitary child care placements.

---

[5] The others identified as officers or directors were Watson Anderson, Gwendolyn Mizell, and Samuel Hingha.

[6] The application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code defines a "disqualified person," in relevant part as "any person who, if the applicant organization were a private foundation, is . . . [a] foundation manager . . . [or a] 'member of the family' of any [such] person. . . ."

[7] The other incorporators listed were William Davis and Ida Porter. Both Mrs. Porter and Mr. Davis denied any involvement in the creation or incorporation of CCN.

-4-

B. CCN will provide and set up before and after school programs for the school-aged child up to nine (9) years old.

C. CCN will oversee basic and specialty health and nutritional services.

D. CCN will serve as a resource to child care providers in training, physical improvements, and other components.

E. CCN proposes to provide personal and social counseling to AFDC families at the earliest possible date.

F. Funding Sources: Federal grants, federal/state funds and grants, USDA Food Program, fund-raisers, and donations.

SUMMARY: The plight of minority children deserves urgent attention and action for care, enrichment, education and general services. Cherokee Children Nutrition (CCN) is formed to respond positively and culturally to these needs of a growing population who will become our leaders, parents, and professionals.

The Charter of CCN was amended in 1999 to reflect a new address. CCN also had no members. CCN also filed an application with the IRS for exemption under 501(c)(3) of the Internal Revenue Code. In CCN's IRS exemption application, Mrs. Madison, Mr. Davis, John Madison Sr.,[8] and Ida Porter were listed as the Executive Director, Secretary, Treasurer, and Chairperson of the Board of Directors, respectively. The application stated that Mrs. Madison was the only person that received compensation from the corporation and that the amount of that compensation was $50,000.[9] CCN represented that none of the officers were disqualified persons with respect to the organization and that the corporation was not controlled by any other organization. CCN failed to answer the question of whether it was the outgrowth of (or successor to) another organization or whether it had a special relationship with another organization by reason of interlocking directorates or other factors. CCN also stated that its facilities and operations would not be managed by another organization or individual under a contractual agreement and that it was not a party to leases. The IRS approved the application for tax exempt status.

---

[8]Mr. Madison is the husband of WillieAnn Madison.

[9]Other testimony and records indicate that as of December 1999, the corporations proposed a budget to DHS apportioning Mrs. Madison's $125,000 salary, with $100,000 to be paid by CCFS and $25,000 by CCN. An employee of DHS testified that the Department agreed to divide her salary between the two entities based upon her estimate that her time was roughly divided based on the number of employees each entity had, approximately 12% to CCN and 88% to CCFS. This discussion of salary does not address other additional compensation such as bonuses.

Under the 1990 contract with DHS, the State compensated CCFS and CCN by reimbursing the company for expenses incurred.[10]  The contracts in effect from 1992 to 1999 significantly changed the payment program by providing that CCFS and CCN would be paid a percentage (between 3% and 3.5%) of the funds DHS paid to daycare centers for Cherokee-placed children. CCFS was not required to report its costs to DHS under this type of contract.[11]  From January 1, 2000, to August 21, 2000, the parties operated under a third contract that reverted to the cost reimbursement plan.[12]

Our Supreme Court has recently described the relationship between CCFS and the State:

Between 1990 and 2000, Cherokee contracted with TDHS to perform certain functions related to government-subsidized child care services in Shelby County.  It is important to note here that Cherokee did not 'care for' or 'keep' children in the

---

[10]The Tennessee Supreme Court recently stated that:

The first contract, executed in 1990, was a grant contract under which Cherokee performed services on a cost-reimbursement basis.  Prior to the commencement of any work by Cherokee, the State would approve "allowable costs" in advance, then Cherokee would spend funds to perform the work and invoice the State for reimbursement of the approved costs.

*Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, No. M2000-2382-SC-R11-CV & No. M2000-01705-SC-R11-CV, 2002 Tenn. LEXIS 379, at *6, ___ S.W.3d ___, ___ (Tenn. Sept. 5, 2002).

[11]The Supreme Court found that:

The second contract, in effect from 1992 to 1999, changed the method of payment to a fee-for-services arrangement, under which Cherokee was paid a "commission" calculated as a percentage of the funds disbursed by TDHS to day care centers as a result of Cherokee's administrative services.  The money received by Cherokee under the 1992 contract was dependent only on satisfactory performance of the work and on the total funds disbursed by the State to day care services; the State disclaimed any responsibility for losses or taxes incurred by Cherokee in the performance of the contract.

*Memphis Publ'g Co.*, 2002 Tenn. LEXIS 379, at *6, __ S.W.3d at ___.

[12]The affidavit of Dilworth Weathers, assistant to Mrs. Madison, states:

In 1999, the State selected Cherokee [CCFS] to administer the child care brokerage program under the new cost reimbursement system. . . .  Under the new program put out for bid, the selected contractor would pay the expenses of the program in compliance with a budget which had been pre-approved by the state.  Under the cost reimbursement contract, the selected contractor would submit to the State, on monthly vouchers, expenses incurred by the contractor which the contractor believed had been incurred in accordance with the State-approved budget.

The corporations' brief explains that at the end of 1998, when Cherokee was preparing to apply for the 2000 broker contract, it was informed that it would be a reimbursement/grant contract. In order to apply for that contract, CCFS was required to submit a proposed budget to DHS before any reimbursement claim could be made.

strictest sense. Rather, it served as a 'brokering agency' that screened applicants and assisted eligible applicants in locating approved child care providers. TDHS paid the child care subsidies directly to the care centers; Cherokee, therefore, was not involved in the payment of subsidies for the child care services. Virtually all of Cherokee's operating revenue, however, came from government sources.

*Memphis Publ'g Co. v. Cherokee Children & Family Services*, No. M2000-2382-SC-R11-CV & No. M2000-01705-SC-R11-CV, 2002 Tenn. LEXIS 379, at *5, ___ S.W.3d ___, ___ (Tenn. Sept. 5, 2002).

As the Supreme Court found, the vast majority of the income of both CCFS and CCN has come from contracts with DHS or other government programs.[13] The total revenue received from DHS by CCFS and CCN, including earned commissions, was $3,055,004 in 1998, $6,869,465 in 1999, and $4,910,477.08 in 2000. All of CCFS's employees performed services under the contracts with the state. *Id.*

Mrs. Madison has been the Executive Director of CCFS and CCN since their inception. Her compensation included a salary and, from time to time, she has received additional compensation or bonuses. According to CCFS, this additional compensation was based on the success of the program.

The State canceled its contract with CCFS by letter dated August 21, 2000, which termination was to be effective September 22, 2000. CCN received a letter on August 21, 2000, terminating its contract with DHS effective that day.

After the Attorney General began the investigation that led to the institution of this action, the current Board of Directors, which consists of two longtime members and two new members, undertook to review past corporate action or transactions, including related party transactions, as well as the allegations of the complaint regarding misapplication or wasting of assets. The Board ratified many of the prior transactions, instituted new controls, reduced its operating expenses significantly because of the loss of the State contracts, and settled an issue of rent overpayments, as more fully discussed below.

The corporate assets of CCFS remaining were reported by the appointed receiver to include approximately $288,000 in cash in various accounts; three (3) vehicles; 30,000 shares of stock in

---

[13]The Supreme Court found that over ninety-nine percent (99%) of CCFS's funding came from governmental sources. *Id.* 2002 Tenn. LEXIS 379, at *6, ___ S.W.3d at ___.

Memphis First Community Bank;[14] real property; and office equipment.[15] CNN's assets included approximately $2,900 in cash in accounts. The remaining assets of these nonprofit corporations are what is at stake in this litigation. The Attorney General sought to have a receiver appointed to identify and protect those assets and to distribute them to other nonprofit entities after dissolution of the corporations. The corporations sought to maintain control of the assets.

## II. The Issues

The Attorney General's action is based on Tenn. Code Ann. § 48-64-301(a)(1) which authorizes a court to dissolve a nonprofit corporation in an action brought by the Attorney General if it is established that the corporation:

(A) Obtained its charter through fraud;
(B) Has exceeded or abused the authority conferred upon it by law;
(C) Has violated any provision of law resulting in the forfeiture of its charter;
(D) Has carried on, conducted, or transacted its business or affairs in a persistently fraudulent or illegal manner;
(E) Is a public benefit corporation and the corporate assets are being misapplied or wasted; or
(F) Is a public benefit corporation and is no longer able to carry out its purposes; provided, that the enumeration of these grounds for dissolution shall not exclude actions or special proceedings by the attorney general and reporter or other state officials for the dissolution of a corporation for other causes as provided in this chapter or in any other statute of this state; . . . .

In such a proceeding, the court also has authority to "issue injunctions, appoint a receiver or custodian *pendente lite* with all powers and duties the court directs, take other action required to preserve the corporate assets wherever located, and carry on the business of the corporation until a full hearing can be held." Tenn. Code Ann. § 48-64-302(c).

On appeal, the Attorney General argues that several of the statutory grounds were established: (1) the corporations abandoned their public purpose and have been devoted to private gain and, consequently, the corporate assets were misapplied or wasted; (2) the corporations have operated in a persistently fraudulent and illegal manner; and (3) the corporations are unable to carry out their nonprofit purposes.

In response, the corporations argue that: (1) the Attorney General failed to allege or show that the corporations conducted their business in a persistently fraudulent or illegal manner; (2) the

[14]The receiver reported that CCFS had 19,000 shares and CCN had 11,000, with a total purchase price of $300,000.

[15]On May 4, 2001, an agreed order of sale and compromise was entered by the trial court approving the sale of certain items, primarily office furniture, to WillieAnn Madison and John Madison for $5,300.

Attorney General failed to prove that Cherokee's corporate assets were misapplied or wasted; (3) the Attorney General cannot show that the corporations are no longer able to carry out their purposes; and (4) the business judgment rule, plead as an affirmative defense, insulates certain corporate actions by creating a presumption of the regularity of business decisions, and the Attorney General failed to overcome that presumption. In addition, the corporations assert that summary judgment was improper because there are disputed material facts, the Attorney General failed to meet his burden of proving that dissolution was warranted, no expert proof was presented on issues requiring such proof, and the corporations presented their own expert proof to rebut several claims. Finally, the corporations assert that some of the documents and records filed by the Attorney General in support of the motion for summary judgment were unauthenticated and contained some inadmissible evidence, should not have been considered by the trial court, but could have been so considered.

## III. Nonprofit Corporations

The two corporations were both formed pursuant to the Tennessee Nonprofit Corporation Act, Tenn. Code Ann. §§ 48-51-101 *et. seq.*[16] Nonprofit corporations in Tennessee can be religious corporations, public benefit corporations, or mutual benefit corporations. Tenn. Code Ann. § 48-52-102(a)(2). Both corporations herein are public benefit corporations.

> Nonprofit corporations can be divided into two classes. One called donative nonprofits or public benefit corporations; the other called commercial nonprofits or mutual benefit corporations. The donative type is generally a charitable organization providing service to the general public.

19 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2:15 (Perm. ed. 1994) (citations omitted). Under the Revised Model Nonprofit Corporation Act, public benefit corporations are treated differently from the other two classifications in several areas, including: (1) the ability to make distributions to members or controlling persons and (2) the supervisory powers vested in the attorney general of the state of incorporation.

Both corporations herein also applied for and received tax exempt status under § 501(c)(3) of the Internal Revenue Code, and both adopted corporate statements indicating their intent was to operate as a § 501(c)(3) organization.[17] That section exempts from taxation "corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." It also requires that "no part of the net earnings of [the exempt organization] inures to the benefit of any private shareholder or

---

[16]By 1987 Tenn. Pub. Acts, ch. 242, Tennessee adopted the Revised Model Nonprofit Corporation Act, which became effective January 1, 1988.

[17]Charitable nonprofit organizations are exempt from federal income taxation under provisions of the Internal Revenue Code. In addition, entities exempt under section 501(c)(3) are entitled to receive tax deductible contributions from donors.

individual." This prohibition on the distribution of net earnings is reinforced by federal regulations interpreting § 501(c)(3):

> [A]n organization is not organized or operated exclusively for one or more [charitable purposes] . . . unless it serves a public rather than a private interest. . . . [I]t is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

Treas. Reg. § 1.501(c)(3) - 1(d)(1)(ii) (as amended in 1991).

These definitions describe the most commonly used and understood meaning ascribed to "nonprofit" entities. "Nonprofit corporations generally are recognized to be public or charitable in nature." *State ex rel Boone v. Sundquist*, 884 S.W.2d 438, 444 (Tenn. 1994). A basic distinction between for profit and nonprofit entities is the possibility of private enrichment. Thus, "[i]n general terms, a nonprofit enterprise is an organization in which no part of the income is distributable to its members, directors or officers . . . ." RONALD LEE GILMAN, TENNESSEE CORPORATIONS § 11B-1 (2001). To be more precise,

> . . . one crucial feature distinguishes nonprofit corporate governance from that of for-profit corporations: nonprofit corporations are subject to the non-distribution constraint. The non-distribution constraint prevents the organization from distributing its net earnings to those in control of the corporation; . . . .

*Developments in the Law - - Nonprofit Corporations*, 105 HARV. L. REV. 1578, 1582 (May 1992) (footnotes omitted).

In fact, it has been stated that, "[t]he basic question to be asked in determining whether a corporation is 'nonprofit' is whether the corporation is being exploited for direct monetary gain." FLETCHER, *supra*, at § 68.05. There is no prohibition on a nonprofit corporation conducting enterprises for income or from accumulating earnings. However, such revenues must be used for the purposes set forth in the charter and there must be no pecuniary gain to the incorporators or members, and no distribution of income or profits to them. *Id.*

Under the Model Nonprofit Corporation Act (1964) a "not for profit" corporation was defined as a corporation no part of the income of which is distributable to its members, directors or officers. MODEL NONPROFIT CORPORATION ACT § 2 (1964); FLETCHER, *supra*, at § 68.05. Although the Revised Model Act did not retain this definition, that decision has been explained as follows:

> The Drafting Committee, on the other hand, took the position that provisions of the Revised Act such as the election between public benefit and mutual benefit status, the limitations on distributions to members or controlling persons in a public benefit

corporation, restrictions on unreasonable compensation, and the regulatory powers of the attorney general provided ample regulation to insure nonprofit operation. In addition, the Drafting Committee had concluded that the ability of any corporation to limit the corporate purposes in its articles of incorporation provided ample protection and allowed the corporation to obtain tax exempt status and attract specific contributions.

Lizabeth A. Moody,[18] *The Who, What, and How of the Revised Model Nonprofit Corporation Act*, 16 N. KY. L REV. 251, 281 (1988).

This prohibition on distribution of corporate assets or earnings to those operating a nonprofit corporation has been reinforced by specific statutory provisions. Under Tenn. Code Ann. § 48-63-101 a nonprofit corporation may make no distributions that are not authorized by Tenn. Code Ann. § 48-63-102. That section provides that a public benefit corporation may make distributions to its members: (1) who are public benefit corporations; and (2) if in conformity with its charitable purposes. Tenn. Code Ann. § 48-64-102(b). "Distribution" is defined as "the direct or indirect transfer of assets or any part of the income or profit of a corporation, to its members, directors, or officers." Tenn. Code Ann. § 48-51-201(11). Thus, in combination, these statutes clearly prohibit the transfer of assets, income, or accumulated revenue to any individual who is a member, director, or officer of the corporation. The statutory exception to that prohibition is found in the definition "distribution."

"Distribution" does not include:

(A) The payment of compensation in a reasonable amount to its members, directors, or officers for services rendered;
(B) Conferring benefits on its members in conformity with its purposes;
(C) Repayment of debt obligations in the normal and ordinary course of conducting business activities; or
(D) The incurrence of indebtedness, whether directly or indirectly (including through a guaranty), for or on behalf of a member, director or officer.

*Id.*

In addition to these limitations on distributions, nonprofit corporations are specifically prohibited from lending money to, or guaranteeing the obligation of, a director or officer of the corporation. Tenn. Code Ann. § 48-58-303.

---

[18]Ms. Moody was chair of the Nonprofit Corporations Committee, Section of Business Law of the American Bar Association which drafted the Revised Model Nonprofit Corporation Act.

Nonprofit corporations are eligible for beneficial treatment in a number of areas,[19] particularly taxation. Such treatment is in recognition of the benefit to the public good resulting from the work of most nonprofit organizations. Exemption from federal taxation and tax-deductibility of donations are benefits of classification as a § 501(c)(3) entity, but that classification is based upon essentially charitable purposes where the public good is served, not the private interest of any corporate insider.

The federal tax exemption, which has appeared in federal tax statutes since 1894, seeks "to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind." *Bob Jones Univ. v. United States*, 461 U.S. 574, 588, 103 S. Ct. 2017, 2026 (1983). It is the unmistakable legislative intent that entitlement to 501(c)(3) tax exemption "depends on meeting certain common-law standards of charity - - namely that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Id*. 461 U.S. at 586, 103 S. Ct. at 2026. The objective of the exemption was to promote certain charitable purposes, a term that has been used in the law of charitable trusts for hundreds of years. *Id*. 461 U.S. at 588, 103 S. Ct. at 2026.

Similarly, the Tennessee Constitution authorizes the legislature to exempt from taxation property held and used for purposes purely religious, charitable, scientific, literary, or educational. Tenn. Const. art. II, § 28. The legislature has enacted statutes providing for such exemption, but has specifically stated the property of institutions shall not be exempt if:

> The organization thereof for any such avowed purpose be a guise or pretense for directly or indirectly making any other pecuniary profit for such institution, or for any of its members or employees, or if it not be in good faith organized or conducted exclusively for one (1) or more of these [religious, charitable, scientific, or educational] purposes.

Tenn. Code Ann. § 67-5- 212(a)(3)(B).

This exemption and the liberal interpretation applied to tax exempt statutes are based upon the "benefit conferred on the public by such institutions, and a consequent relief, to some extent, of the burden upon the state to care for and advance the interests of its own citizens." *LaManna v. Elec. Workers Local Union No. 474*, 518 S.W.2d 348, 352 (Tenn. 1974) (quoting *Book Agents of*

---

[19]The beneficial treatment of nonprofit organizations has been described as follows:

> Nonprofit organizations receive their most conspicuously favorable treatment through the tax laws. They have, historically, received privileged treatment in many other areas of the law as well. Specifically, nonprofits have enjoyed special treatment under the laws governing unemployment insurance, bankruptcy, Social Security, collective bargaining, securities regulation, the minimum wage, copyright, antitrust, custom duties, and postal rates.

*Developments in the Law - - Nonprofit Corporations*, *supra*, at 1677-78.

*Methodist Episcopal Church, South v. State Bd. of Equalization,* 513 S.W.2d 514, 521 (Tenn. 1974)).

Thus, it is clear that the bargain made with the government, the taxpayers, and the public in return for benefits such as tax exemption is that the organization will be operated for the public good and not to enrich those involved in running it.

Even before the adoption of the Revised Model Nonprofit Corporation Act, it has long been the law in Tennessee that nonprofit corporations are required to operate for public purposes and not for individual private gain. *See, e.g., Highlander Folk Sch. v. State ex rel. Sloan*, 208 Tenn. 234, 240, 345 S.W.2d 667, 669 (1961) (holding that the operation of a school for the personal gain of the individual who controlled the finances and to whom the school's real property was given was "a misuse and abuse of its powers, and perversive of the objects for which it was created and injurious to the public").

Adherence to the fundamental character of a nonprofit corporation is intended to be insured, in part, by the fiduciary duties imposed on officers and directors of such corporations. It is well established that officers and directors of a for profit corporation owe a fiduciary duty to the corporation and its members or shareholders. *Founders Life Corp. v. Hampton*, 597 S.W.2d 897, 899 (Tenn. 1980); *Johns v. Caldwell*, 601 S.W.2d 37, 41 (Tenn. Ct. App. 1980). Directors and officers of corporations are bound to the exercise of the utmost good faith, loyalty, and honesty toward the corporation. *Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988); *Hayes v. Schweikart's Upholstering Co.*, 55 Tenn. App. 442, 466, 402 S.W.2d 472, 483 (1965). "[T]he directors of a corporation have to see to it that the corporation had the benefit of their best judgment and act solely and always with reasonable care in good faith to promote its welfare." *Neese v. Brown*, 218 Tenn. 686, 700, 405 S.W.2d 577, 584 (1964).

Directors and officers of nonprofit corporations also owe a fiduciary duty to the corporation. *State ex rel Oliver v. Soc'y for Pres. of Common Prayer*, 693 S.W.2d 340, 343 (Tenn. 1985). There are two basic fiduciary duties: the duty of care and the duty of loyalty. They are embodied in the Revised Model Nonprofit Corporation Act[20] and have been enacted in Tennessee:

(a) A director shall discharge all duties as a director, including duties as a member of a committee:

(1) In good faith;
(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

---

[20]The official comments to the Revised Act state that the general duty of loyalty is found in the requirement that directors act in good faith and in a manner they reasonably believe is in the best interest of the corporation and that the duty of care is stated in the prudent person in a like position requirement. REVISED MODEL NONPROFIT CORPORATION ACT § 8.3 cmt. 2 and 4 (1987).

(3) In a manner the director reasonably believes to be in the best interests of the corporation.

Tenn. Code Ann. § 48-58-301. A corporate officer with discretionary authority is subject to the same standards. Tenn. Code Ann. § 48-58-403.

These statutory standards of conduct for directors and officers of nonprofit corporations are similar to those for their counterparts in for profit corporations.[21] However, because the missions of the two types of corporations are different, the duty of loyalty is defined somewhat differently. The officers and directors of a for profit corporation are to be guided by their duty to maximize long term profit for the benefit of the corporation and the shareholders.[22] A nonprofit public benefit corporation's reason for existence, however, is not to generate a profit. Thus, a director's duty of loyalty lies in pursuing or ensuring pursuit of the charitable purpose or public benefit which is the mission of the corporation.

"The central purpose of fiduciary duties of officers and directors of nonprofit corporations is to ensure that a corporation's resources are used to achieve the corporation's purposes and not to enrich the directors." *Developments in the Law - - Nonprofit Corporations*, *supra*, at 1601. In particular, the duty of loyalty requires that a director or officer faithfully pursue the interest of the organization, and its nonprofit purpose, rather than his or her own financial or other interests, or those of another person or organization. Harvey J. Goldschmid, *The Fiduciary Duties of Nonprofit Directors and Officers: Paradoxes, Problems, and Proposed Reforms*, 23 IOWA J. CORP. L. 631, 641 (1998). Thus, nonprofit directors and officers must be "principally concerned about the effective performance of the nonprofit's mission." *Id*. Although principles of law governing for profit corporations generally govern the activities of a nonprofit corporation, those who control a nonprofit corporation "have a special duty to advance its charitable goals and protect its assets." *Oberly v. Kirby*, 592 A.2d 445, 472-73 (Del. 1991).

---

[21] The Revised Model Act provisions rejected the theory that nonprofit corporations hold their assets in trust for the stated purposes at the time of acquisition and that the directors are trustees with respect to those assets. Evelyn Brody, *The Limits of Charity Fiduciary*, 57 MD. L. REV. 1400, 1427 (1998); Moody, *supra*, at 263. Adopting the provision from the Revised Model Act, Tenn. Code Ann. § 48-58-302(e) provides that "A director shall not be deemed to be a trustee with respect to the corporation or with respect to any property held or administered by the corporation, including without limitation, property that may be subject to restrictions imposed by the donor or transferor of such property."

[22] This court has stated:

> The duty of loyalty [in a for profit corporation] in essence involves conflicting economic or other similar interest [and] is transgressed when a corporate fiduciary, whether director or officer, uses his or her corporate office to promote, advance or effectuate a transaction between the corporation and such person, and that transaction is not substantively fair to the corporation.

*Hall v. Tennessee Dressed Beef Co.*, No. 01-A-01-9510-CH-00430, 1996 Tenn. App. LEXIS 384, at *16 (Tenn. Ct. App. June 28, 1996) (no Tenn. R. App. P. 11 application filed) (quoting 3 FLETCHER, *supra*, at § 837.60).

-14-

In addition to the duties of care and loyalty, or as part of them, certain transactions, called conflict of interest transactions, between the corporation and a director or officer are subject to close scrutiny. "[C]lose investigation is accorded a corporation's transactions with an officer or director, and the burden of proof is placed upon the officer or director because of his fiduciary capacity." *Johns,* 601 S.W.2d at 41(citing *Intertherm, Inc. v. Olympic Homes Sys.*, 569 S.W.2d 467, 471 (Tenn. Ct. App. 1978)). At common law, an absolute prohibition existed against contracts between corporations with common directors, but that prohibition has been modified by statute. *Tenn. Dressed Beef Co. v. Hall*, 519 S.W.2d 805, 807 (Tenn. Ct. App. 1974).

A conflict of interest transaction is statutorily defined as "a transaction with the corporation in which a director or officer of the corporation has a direct or indirect interest." Tenn. Code Ann. § 48-58-302(a). A director or officer has such an interest if, but not only if, "another entity in which the director or officer has a material interest . . . is a party to the transaction" or "another entity of which the director or officer is a director, officer, or trustee is a party to the transaction." Tenn. Code Ann. § 48-58-302(c).

Under the Revised Model Nonprofit Corporation Act, any conflict of interest transaction is voidable by the corporation, and may be the basis for liability of a director or officer, unless the transaction was fair at the time it was entered into or is approved in accordance with statutory provisions. Tenn. Code Ann. § 48-58-302(a). A conflict of interest transaction may be approved if:

> (1) The material facts of the transaction and the director's or officer's interest were disclosed or known to the board of directors or a committee consisting entirely of members of the board of directors and the board of directors or such committee authorized, approved, or ratified the transaction;
> (2) The material facts of the transaction and the director's or officer's interest were disclosed or known to the members and they authorized, approved, or ratified the transaction; or
> (3) Approval is obtained from:
> (A) The attorney general and reporter; or
> (B) A court of record having equity jurisdiction in an action in which the attorney general and reporter is joined as a party.

Tenn. Code Ann. § 48-58-302(b).[23] Any approval by the board requires the affirmative vote of a majority of the directors who have no direct or indirect interest in the transaction, but no such transaction may be approved by a single member of the board. Tenn. Code Ann. § 48-58-303(d).

---

[23]Under the Revised Model Nonprofit Corporation Act, the approval by the disinterested, informed board of directors of a public benefit corporation must be made in advance of the transaction. Brody, *supra*, at 1427-28; Moody, *supra*, at 268. However, in its adoption of the Revised Act, Tennessee did not adopt the "in advance" language appearing in the Revised Model Act's provision on approval by the board of directors. *See* REVISED MODEL NONPROFIT ACT § 8.31 (1987); 1 FLETCHER, *supra*, at § 2.75.10.

Approval meeting the statutory requirements, however, simply removes the voidability of the transaction by the corporation, or personal liability for directors and officers. In addition, directors considering such approval must comply with their fiduciary duties in deciding whether to approve.[24] Such approval does not obviate the requirements of nondistribution to corporate insiders and use of assets for public benefit purposes.

Where corporate officers and directors do not, contrary to their fiduciary duties, advance the corporation's charitable goals, protect its assets, and ensure that its resources are used to achieve the corporation's purposes and not to enrich those who control the corporation, other remedies exist. Tenn. Code Ann. § 48-64-301(a)(2) authorizes dissolution of a nonprofit corporation in a proceeding brought by a specified number or percentage of voting members upon proof of one of several grounds, including where "the corporate assets are being misapplied or wasted" or where "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Tenn. Code Ann. §§ 48-64-302(a)(2)(B) & (D).

Even before the adoption of the Revised Model Nonprofit Corporation Act, Tennessee recognized the right of members of a nonprofit corporation to bring the equivalent of a shareholder derivative action against the directors and officers for wasting corporate assets and using corporate assets for personal gain. *Bourne v. Williams*, 633 S.W.2d 469 (Tenn. Ct. App. 1981). The *Bourne* court found that Tennessee had long recognized the right of aggrieved shareholders to sue for the benefit of the corporation to rectify a wrong to the corporation and "that members of nonprofit corporations have the same rights in this regard as stockholders of corporations for profit," citing *Knapp v. Supreme Commandery, U.O.G.C. of the World*, 121 Tenn. 212, 118 S. W. 390 (1908) and *Range v. Tennessee Burley Tobacco Growers Ass'n*, 41 Tenn. App. 667, 298 S.W.2d 545 (1955), as cases where such actions were brought but the right to sue as members of a nonprofit corporation was not disputed. *Bourne*, 633 S.W.2d at 471-472. *See also Hannewald v. Fairfield Cmtys., Inc.*, 651 S.W.2d 222, 225-26 (relying on *Bourne*, the Tennessee Corporation Act, and Tenn. R. Civ. P. 23.06 to find that a member of a nonprofit corporation could bring a "derivative" action for the benefit of the corporation).

This right, however, is not effective where, as here, a nonprofit corporation has no members. Consequently, statutory authority has been given to the Attorney General to act in the public good in enforcing the requirements applicable to nonprofit corporations, particularly public benefit corporations. *State ex rel. Adventist Health Care Sys. v. Nashville Mem'l Hosp., Inc.* 914 S.W.2d 903, 907 (Tenn. Ct. App. 1995). The Tennessee statutes mirror the provisions of the Revised Model Nonprofit Corporation Act, and the authority given therein to the Attorney General was designed to protect the public interest in the operation of nonprofit public benefit corporations.

---

[24]Tenn. Code Ann. § 48-58-304 provides that a director who votes for or assents to a distribution made in violation of the nonprofit corporation statutes and does not comply with standards of conduct established in Tenn. Code Ann. § 48-58-301 is personally liable to the corporation.

Since the enactment of the Statute of Charitable Uses in the sixteenth century, a major device for regulating charities has been the power of the attorney general to regulate or investigate charitable trusts. Over time, this power has been recognized and applied to nonprofit corporations organized for charitable purposes. The Revised [Model Nonprofit Corporation] Act has extended this concept to reach all nonprofit corporations in varying degrees. The state under the Revised Act has limited power to regulate mutual benefit and religious corporations, but it has broad power of supervision over the public benefit corporation. This is one of the features of the Revised Act that is both most criticized and most complimented. The Drafting Committee, however, accepted such provisions on the rationale that public benefit corporations, which usually have no participants with a sufficient economic interest to assure oversight, can only be made accountable for their use of assets if there are broad powers of regulation in a state officer. To that end, the Revised Act provides standing to the attorney general to protect the public interest.

Moody, *supra*, at 262-63.[25] The drafters of the Revised Model Act intended that the Attorney General of the incorporating state have wide discretion and broad powers in regulating public benefit corporations to ensure that they operate as nonprofits. Moody, *supra*, at 262, 265, 266, and 269.

An official comment to the Revised Act provides:

The failure to set forth an explicit limitation on a nonprofit organization's activities [in terms of limiting corporate purposes] does not mean that an enterprising entrepreneur can improperly and with impunity operate in the nonprofit form. In general, public benefit and religious corporations cannot make distributions to members or controlling persons. Unreasonable compensation cannot be paid to members or controlling persons. In addition, the attorney general has broad powers to ensure that a public benefit corporation is not operating for the private benefit of any individual.

REVISED MODEL NONPROFIT CORPORATION ACT § 3.01 cmt. (1987) (citations omitted).

---

[25] In addition to the provision authorizing the action brought herein, pursuant to Tenn. Code Ann. § 48-58-110(a)(1), the Attorney General may bring an action to remove a director of a public benefit corporation who is "engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation." Further, a dissolving public benefit corporation must notify the Attorney General of its intent to dissolve and the distribution of its assets, and no assets may be transferred until the passage of twenty (20) days, consent by the Attorney General, or notice that the Attorney General will take no action regarding the transfer. Tenn. Code Ann. § 48-64-103. Under this section, the Attorney General has "authority to bring any action he deemed necessary to protect the public interest . . . ." *State ex rel. Adventist Health Care Sys.*, 914 S.W.2d at 906. Additionally, the Attorney General is authorized to bring an action to enjoin a corporate act on the ground the corporation lacked power to act. Tenn. Code Ann. § 48-53-104(b).

The statute itself, Tenn. Code Ann. § 48-64-301, establishes grounds for dissolution of nonprofit corporations in general. Subsection (a)(1) applies to dissolution actions brought by the Attorney General, and subsections (a)(1)(E) and (F) apply only to public benefit corporations. There can be no question that the legislature intended to provide oversight of public benefit corporation assets to ensure their proper use and prevent their misapplication.

Thus, the Attorney General, acting in the public interest, has authority to seek dissolution of a nonprofit public benefit corporation which fails to devote its assets to a public, rather than a private, interest. Where such a corporation is operated for the private benefit of an individual in contravention of the principles governing nonprofit status and its accompanying benefits, or where, as the trial court phrased it, the corporation has abandoned its public benefit, charitable purpose, action by the Attorney General and the courts is warranted.

IV. Summary Judgment

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State,* 36 S.W.3d 62, 65 (Tenn. 2001).

Summary judgments enjoy no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

A party seeking summary judgment has the burden of demonstrating that its motion satisfies the requirements of Rule 56, including its entitlement to judgment as a matter of law. *Carvell v. Bottoms*, 900 S.W.2d 23, 25 (Tenn. 1995); *Jones v. City of Johnson City*, 917 S.W.2d 687, 689 (Tenn. Ct. App. 1995). When a party seeking summary judgment makes a properly supported

motion, the burden shifts to the nonmoving party to set forth specific facts which must be resolved by the trier of fact. *Byrd*, 847 S.W2d at 215.

This court's role in review of the grant of summary judgment is to review the record and determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000). Our perspective is the same as that of the trial court. *Gonzales v. Alman Const. Co.*, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993). Therefore, we must decide anew if the movant is entitled to summary judgment; that is, whether the material facts are not in dispute and conclusively show that the Attorney General is entitled to judgment. Because summary judgment "is clearly not designed to serve as a substitute for the trial of genuine and material factual matters," *Byrd*, 847 S.W.2d at 210, we must first determine what facts are undisputed and whether any disputed facts are material to determination of the legal issues involved.

This determination is complicated in the case before us because of the volume of documents involved and because of general objections by the corporations to consideration of a number of documents on the basis they are not properly in the record. The nature of these objections was set out in response to the Attorney General's statement of undisputed facts filed pursuant to Tenn. R. Civ. P. 56.03.[26] CCFS and CCN began their Response and Objections to the Attorney General's Statement of Undisputed Facts by making a general evidentiary objection. This objection stated, in pertinent part:

> This objection addresses what has become a practice of the Plaintiff [Attorney General] which is at odds with the Tennessee Rules of Evidence and Tennessee precedent. On or about February 23, 2001, Plaintiff submitted its Third Notice of Filing referencing the filing of nineteen (19) exhibits identified by volume and exhibit number. These exhibits were merely attached to the Third Notice with no attempt to authenticate or otherwise lay a foundation for their admissibility and use. Thereafter, upon application for summary judgment and in its Statement of

---

[26]That rule provides:

> In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure shall be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.

> Any party opposing the motion for summary judgment must . . . file a response to each fact set forth by the movant either (i) agreeing that the fact is undisputed, (ii) agreeing that the fact is undisputed for purposes of ruling on the motion for summary judgment only, or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record. Such response shall be filed with the papers in opposition to the motion for summary judgment.

Tenn. R. Civ. P. 56.03.

Undisputed Facts, however, Plaintiff cites to its Third Notice of Filing over 120 times as if the documents contained therein were properly before this Court. Cherokee objects to this naked filing and use, as many of these documents are inadmissible on the grounds that the Plaintiff has failed to properly authenticate the documents and as they also contain inadmissible hearsay.

CCFS and CCN argued that because the objectionable exhibits were unauthenticated, the exhibits were not properly a part of the record before the court and could not be considered on a motion for summary judgment.[27] The response also included a list of some specific exhibits submitted with the first Notice of Filing which the corporations asserted should be inadmissible for use in deciding summary judgment. In addition, in some of the numbered responses, the corporations pointed out the specific document being challenged and the basis for the challenge.

The Attorney General filed a reply to CCFS's and CCN's response and asserted, with reference to various specific responses, that the corporations had not complied with Tenn. R. Civ. P. 56.03 by not making specific citations to the record; that the defendants had previously admitted some facts in their verified answers; and that "extraneous statements made by Defendants are immaterial." In addition, the Attorney General addressed some of the evidentiary deficiencies alleged by the corporations.

On appeal, CCFS and CCN have again raised their objection to "*numerous* volumes of unauthenticated documents and records," alleging that "*[s]ome of* these documents and filings failed to meet even the most basic evidentiary rules" and to "*numerous*" affidavits they allege were not based on personal knowledge and contained hearsay and other inadmissible evidence.[28] They also argue that because the trial court never ruled on their motions to strike these filings and because the court did not detail its findings, CCFS is unsure whether the trial court relied on this inadmissible evidence. If it did so rely, they assert, such reliance was error.

In connection with his motion for summary judgment, the Attorney General filed a Tenn. R. Civ. P. 56.03 statement containing some eighty-three (83) undisputed facts. Approximately half of those were undisputed by the corporations. CCFS and CNN also submitted a statement of undisputed facts in support of their motion for summary judgment. We have painstakingly reviewed

[27]CCFS and CCN also filed a motion to strike many of the exhibits that the Attorney General referenced in support of his motion for summary judgment and accompanying statement of undisputed facts. The trial court did not rule on the motion to strike prior to the grant of the Attorney General's motion for summary judgment and denial of CCFS's and CCN's motion for summary judgment. The Attorney General points out that the motion to strike was never set for hearing. Because this court is required to review the evidence in support of summary judgment and determine anew whether judgment was proper, disposition of the motions to strike is not significant to our scope or standard of review.

[28]When asked at oral argument to be more specific regarding the objectionable evidence, counsel responded that it was included in the documents in Boxes 3 and 4 of the record. Consequently, in order to give thorough consideration to the evidentiary issues, we have relied upon the corporations' identification in other filings of the disputed material.

these statements, the objections and responses, the depositions, affidavits and documents or records filed herein, as well as the pleadings, briefs and other filings. In our review, we have resolved the questions of admissibility, where necessary, where raised, and where identifiable, according to the following general principles. *See generally* 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2722 (3d ed. 1998).

As part of the moving party's burden, it must present facts which, if undisputed, demonstrate its entitlement to judgment as a matter of law. Typically, the moving party presents facts to the court in the form of affidavits, authenticated documents, depositions, and other properly-verified factual matters developed through the discovery process. Pleadings, depositions, answers to interrogatories, admissions on file, and affidavits are specifically allowed to be considered in the determination of whether a genuine issue of material fact exists and whether the moving party is entitled to judgment. Tenn. R. Civ. P. 56.04. The proffered sworn-to testimony and/or properly-authenticated documents must be admissible at trial before they can be considered by the trial court on summary judgment. *Byrd*, 847 S.W.2d at 215.

The mere submission of a statement of undisputed material facts by the moving party does not, in of itself, constitute proof of the facts therein. However, when the opposing party agrees that a fact is not disputed pursuant to Tenn. R. Civ. P. 56.03, the court may rely upon that admission in determining whether a genuine issue of material fact exists. A party's sworn pleading based upon personal knowledge can constitute an admission. Similarly, admissions in the brief of the party opposing the motion may be used in determining that there is no genuine issue as to any material fact.

Documents must generally be authenticated by and attached to an affidavit or deposition that meets the requirements of Rule 56. Judicial, legislative, or administrative records must either be certified or properly subject to the judicial-notice doctrine. Business records are admissible if accompanied by affidavit or certificate from the records custodian. Some records are self-authenticating pursuant to the Tennessee Rules of Evidence. Uncertified or otherwise inadmissible material may be considered if not challenged, and the objection must be timely or it will be deemed to have been waived.

## V. The Evidence Supporting Summary Judgment

Based upon our independent review of the record, we have determined that the following facts are supported by admissible evidence and, unless specifically noted otherwise, are undisputed. A dispute as to the existence of a fact or an inference to be drawn from a fact does not preclude judgment if resolution of that dispute is not necessary to a determination that the movant is entitled to judgment as a matter of law on the undisputed facts. We have earlier set out the legal principles applicable to the issues before us regarding the operation of nonprofit public benefit corporations. These facts must be considered from the perspective of those principles.

## A. The Corporations

A full understanding of the significance of some of the specific facts demonstrated by the record requires some discussion of the larger context. Mrs. Madison was the incorporator of both corporations. She served as the executive director throughout the corporate existence. Her husband, John Madison, Sr. was the corporations' accountant. Her father, William Davis, was on the Board of Directors of CCFS for a number of years.[29] The Board also included Rev. C.E. Ware, Mrs. Madison's pastor, who testified that Mr. Madison, as presiding elder over the church district, was Rev. Ware's immediate supervisor. Two of Mrs. Madison's children were employees of the corporation(s), as were her nephew, her stepson, and her husband's nephew.

Most of the various members of the Board had some association with a childcare provider: as owner, manager, director, or employee. Mr. and Mrs. Madison operated a day care center, referred to as Little People. Mr. Davis served on the board of two day care providers. Rev. Joyner, also a member of the CCFS Board of Directors for some years, was pastor of a church which operated a day care center.[30] Rev. Ware was the chairman of the board of directors for his church's day care center. Ida Porter, a longtime Board member, was the director of a daycare program. Phyllis Herring, Mrs. Madison's sister, owned a child care center. As a broker for child care services, CCFS provided parents with lists of available child care centers in their area. All the Board members who gave depositions testified that CCFS did not directly refer any parents to their child care centers; the choice of centers was made by the parents.[31]

CCFS regularly did business with its officers and directors, as more specifically detailed below. The record is replete with references by the auditors to related party transactions. They included purchasing travel arrangements through a charter travel company owned and operated by the church of which Rev. Joyner is the pastor.[32] In addition, CCFS purchased insurance through one

---

[29]Mr. Davis was also listed as an incorporator of both corporations, but he denied any involvement in their initial organization.

[30]Rev. Joyner's church operated a day care center that received a grant of $5,000 from CCFS for playground equipment.

[31]Eventually, Rev. Joyner resigned from the CCFS Board of Directors because he felt it was a conflict of interest to own a day care center and simultaneously serve on the Board of Directors. He testified that new requirements from DHS indicated such a conflict. He also based his resignation on his formation of Memphis and Shelby County Child Care Providers Association, an association that operates more or less like a union. He felt that regulations would preclude him from also serving on the CCFS Board of Directors.

[32]Rev. Joyner described this arrangement as a "subcontract."

Board member[33] and has done a significant amount of business with an equipment rental business owned or managed by a recently appointed Board member.[34] As one Board member expressed it:

> If a person was giving his time to the Board most - - I think it is unkind if you didn't make purchases from them. If they were giving their time serving on the volunteer Board I think it would be unkind if they had a business and you needed something they had, I think it would be unkind not to purchase from them.

Perhaps the most telling description of how the corporations operated came from longtime Board member, Mr. Davis, as he expressed his view of CCFS while testifying about his approval of a particular transaction:

> A. Let me say this. As a Board member I did not know whether we were operating directly for Cherokee [CCFS] or directly for her [Mrs. Madison], I didn't understand that.
>
> Q. Okay. So during Board meetings it was not necessarily clear whether you were operating on behalf of the corporation or operating on behalf of your daughter?
>
> A. That's right.
>
> Q. Why did you fail to understand that distinction?
>
> A. Because I thought it was all one.
>
> Q. Okay. As a Board member you thought that the financial affairs of the corporation and the financial affairs of your daughter were the same?
>
> A. Yes.

---

[33]Clarence Mosley, the current Chairman of the Board of CCFS is the owner of Clarence Mosley Insurance Agency. He is also the authorized agent of Nationwide Insurance, the insurer of CCFS. CCFS has done business with Clarence Mosley Insurance Agency since 1990. CCFS currently pays premiums on at least three policies sold by Mr. Mosley, including: (1) a commercial umbrella policy; (2) a business auto policy; and (3) a business package policy. Mr. Mosely was not on the Board when the initial insurance purchases were made.

[34]Darrell K. Thomas, the current Secretary of the Board of CCFS, is the Chairman and Chief Executive Officer of Thomas Consultants, Inc., an equipment rental business that has done a significant amount of business with CCFS. Mr. Thomas also serves on the Board of Directors of a bank and bank holding company in which the corporations invested. Again, it does not appear that the business relationship with his company originated while Mr. Thomas was on the Board of CCFS.

B.  Revenue of the Corporations

According to a report from the independent auditors, revenues received by CCFS for the past few fiscal years[35] were:

| | | |
|---|---|---|
| FY 1998: | Total Revenues | $3,081,827 |
| | From DHS contracts[36] | $3,055,004 |
| | Interest Income | $ 17,147 |
| | Other Income | $ 9,676 |
| | | |
| FY 1999: | Total Revenues | $6,915,310 |
| | From DHS contracts | $6,869,465 |
| | Interest Income | $ 13,310 |
| | Other Income (CDA Workshop and Training Fees) | $ 26,448 |
| | Other Income (Unidentified) | $ 6,087 |
| | | |
| FY 2000 | Total Revenues | $4,979,916.12 |
| | From DHS contracts[37] | $4,910,477.08 |
| | Interest Income | $ 11,483.82 |
| | CDA Workshop & Training Fees | $ 56,042.60 |
| | Other Income (Unidentified) | $ 1,912.62 |

Filings by CCFS with the IRS[38] reflect the following:

(Charitable)

---

[35]CCFS does not dispute the amounts reflected herein, but disagrees with the "characterization" of the source of the funds as set out in the Attorney General's statement of undisputed facts.  There is no dispute regarding the total amount received from the State, just with what name to apply to the revenues.  The dispute over characterization appears to be related to the distinction made by CCFS in its Form 990 between government grants and government fees and contracts for program services.

[36]For FY 1998 and 1999, this amount includes payments under both the broker and food contracts.

[37]This amount includes payments for broker, food, registration and transportation contracts.

[38]The record includes the IRS Form 990 (Return of Organization Exempt from Income Tax) filed by CCFS for 1995, 1996, 1997, 1998, and 1999.  Each of these forms was signed by WillieAnn Madison as Executive Director and John Madison as Preparer.  Mr. Madison, as CCFS's accountant, prepared the Form 990 each year for CCFS.  Each of the forms in the record is accompanied by a "Certificate of Official Record" certifying that each is a true copy of the Form 990 for CCFS and signed by the Disclosure Officer of the Department of the Treasury, Internal Revenue Service.  The corporations object to consideration of these documents as unauthenticated and inadmissible.  We disagree.  As certified copies of official public records, they are self-authenticating.  Tenn. R. Evid. 902(4).

| Fiscal Year | Total Revenue | Total Expenses | Contributions |
|---|---|---|---|
| 1995 | $1,143,688 | $ 966,648 | $ 1,218 |
| 1996 | $1,576,381 | $1,404,184 | $ 15,795 |
| 1997 | $2,231,860 | $2,159,181 | $ 11,669 |
| 1998 | $3,081,827 | $2,518,843 | $ 36,926 |
| 1999 | $6,915,310 | $6,692,649 | $ 44,779 |

The board of directors has been proud of CCFS's "financial" success, rewarding key employees, especially Mrs. Madison, for that success. The corporations' brief states that CCFS generated revenue in excess of expenses in a number of years, specifically in each of the last four audited years as follows:

| | |
|---|---|
| 1996 | $172,197 |
| 1997 | $ 72,679 |
| 1998 | $562,984 |
| 1999 | $222,661 |

These figures indicate the "profit" left after the corporation made charitable contributions and paid operating expenses. While the contributions were small, many of the operating expenses were significant and were paid to Mrs. Madison, her family, entities in which she had an interest, or others closely associated with the corporation.

## C. Compensation to Mrs. Madison

In her position as executive director, Mrs. Madison was paid an annual salary as well as occasional "additional compensation." According to the corporations, Mrs. Madison received the following compensation:

| | |
|---|---|
| 1994 - 95 | $100,000 |
| 1995 - 96 | $100,000 |
| 1996 - 97 | $165,508 |
| 1997 - 98 | $100,000 |
| 1998 - 99 | $125,000 |
| 1999 - 2000 | $125,000 |

These figures coincide with the returns filed with the IRS, except for FY 1997-98, wherein the corporation reported to the IRS that Mrs. Madison's compensation was $177,000. According to CCFS, Mrs. Madison had "continuously" received salary increases over the term of her employment reaching a salary of $125,000 "by the year 2000." The compensation for 1996-97 is, obviously, inconsistent with this statement unless that amount includes compensation additional to her salary. That appears to be the case. CCFS has stated that Mrs. Madison "has received additional compensation from time to time to compensate her for the enormous success of the program, both

financially and programmatically" and, "at least once during her tenure, the Board of Directors voted to give her a $50,000 bonus." As shown below, corporate records indicate she was given a $50,000 bonus a number of times.

One such $50,000 bonus may account for the 1996-97 compensation figure reported by the corporations. That payment, however, has a long explanation. The Attorney General alleged that in November of 1994, CCFS loaned Mrs. Madison or Affordable Homes, a company owned by the Madisons, $50,000. In response to that allegation, CCFS stated, "this $50,000 was improperly recorded as a loan and should have been recorded as a bonus."[39] The statement that this amount was recorded as a loan is verified by the record. The independent auditor's report on audited financial statements and supplemental information on CCFS for the fiscal year ending June 30, 1996,[40] includes the following statement:

> In November, 1994, Cherokee loaned $50,000 to a company, [of] which Cherokee's executive director is an agent. No repayment terms have been established. At June 30, 1996, the outstanding balance was $53,508 which includes $3,508 of interest at 8.25 percent.

The auditor's Findings and Recommendations accompanying the audit report for that year included the following:

> In November, 1994, Cherokee loaned an affiliate company, Affordable Homes, $50,000. At June 30, 1996, the entire loan plus interest remains outstanding and no repayment provisions have been established.
>
> Recommendation
>
> If loans are going to be made, credit procedures and a payment plan need to be established and provisions for examining the collectability should be implemented.
>
> Management Response
>
> **We concur**. The $50,000 plus interest will be repaid immediately. We will refrain from all future transactions of this nature.

---

[39] Loans to officers are specifically prohibited by Tenn. Code Ann. § 48-58-303. For our purposes, however, it is not necessary to determine whether this transaction was originally a loan or was always a bonus. Our focus is on whether the corporations were operated for public benefit or private gain.

[40] An affidavit from the president of the accounting firm states the firm was approved by the Comptroller to perform independent audits of CCFS and CCN, that the audit reports for FY 96, 97, 98, and 99 were filed with the Comptroller's office, and that they were attached to the affidavit as exhibits.

Despite management's response acknowledging the loan, it was later decided that the "loan" designation was inaccurate. The auditors corrected the entry a year later as explained in the Engagement Memo of June 30, 1997:

> We are aware that the following accounting error has occurred. A bonus was approved for Ms. Madison in 1994 for $50,000. This bonus was never paid as payroll but instead wired to Affordable Homes, owned by Ms. Madison. This treatment of the bonus is inappropriate and as of the 1996 audit the $50,000 plus interest was recorded as a receivable from Affordable Homes.

> We approved the following transactions to correct the error. Affordable Homes reimbursed Cherokee for $50,000 plus interest. Cherokee in turn paid Ms. Madison her bonus of the same amount. The result of this transaction will eliminate the receivable and pay the bonus through payroll as it should have occurred in 1994.

Because Mrs. Madison's reported compensation for FY 96-97 was $165,508, it would appear that her bonus included the interest previously calculated as due from the "loan" of 1994. The resolution of the issue as explained by the auditor indicates that Mrs. Madison received a $50,000 bonus in FY 96-97 that had actually been awarded her in 1994.

In addition to that bonus, CCFS appears to have awarded her other bonuses of $50,000. The minutes of a special meeting of the Board of Directors of CCFS held October 4, 2000,[41] indicate the Board was briefed on the complaint filed by the Attorney General starting this litigation. In a discussion of the Board's review of some prior corporate actions, the minutes include the following:

> The Board also reviewed certain bonuses paid by prior Boards. Cherokee paid WillieAnn a $50,000 bonus in Fiscal Year 96. This was after the Corporation experienced its two best years financially, $286,767 in 1995 and $222,197 in 1996. Based on the financial performance of the Corporation, the Board determined a $50,000 bonus was not unreasonable.

An addendum to the minutes of the December 18, 1996 Board Minutes indicate that the Board recommended that Mrs. Madison be given (at the Christmas party, thus in FY 96-97) "the same bonus amount she had received the previous year in the amount of $50,000." An attached schedule of agency personnel salaries indicated Mrs. Madison's salary for 1995-1996 was $100,000. These documents, therefore indicate Mrs. Madison received a salary of $100,000 and a $50,000

---

[41]The corporations have objected to consideration of "many" of the board minutes as without proper authentication and containing inadmissible hearsay. The minutes of October 4, 2000, however, were exhibits to an authenticating affidavit of the corporate secretary. We also note that CCFS takes the position that the loan identified by the auditors in 1996 was improperly recorded and was really a bonus. We found no evidence in the record to support that statement other than these minutes and the auditor's engagement memo of June 30, 1997. In addition, all the Board minutes in the record were attached to and authenticated by the deposition and affidavit of the former and current secretary.

bonus in FY 1995-96 and in FY 1996-97. Since she also received the delayed 1994 bonus plus interest in FY 1996-97, it is difficult to reconcile these numbers with the amounts provided by CCFS as her annual compensation. Other documents indicate Board approval of a bonus for Mrs. Madison of $50,000 on December 17, 1998. Thus, the records reflect Mrs. Madison was given a $50,000 bonus several times. Those records also indicate that CCFS regularly gave bonuses to employees at Christmas.

Rev. Ware testified that CCFS only paid bonuses once and he did not know who received them. He stated the Board entrusted such matters to Mrs. Madison and would not have questioned a recommendation by her to pay bonuses to employees. Ida Porter testified she never had occasion as a member of the Board to vote on bonuses for employees, including Mrs. Madison. She was unaware that any employees had received bonuses.

### D. Compensation or Distributions to Corporate Insiders

In addition to Mrs. Madison, the corporations also compensated her husband, John Madison, Sr., a certified public accountant, who performed accounting services for CCFS since 1990 and, after its creation, CCN. The independent auditor testified by affidavit that Mr. Madison's accounting firm performed bookkeeping functions for the corporations year round and had at least one staff person who devoted a substantial amount of time to these functions. Mr. Madison was paid $6,000 per month by the corporations.

According to CCFS's 990 filings, CCFS paid as compensation to officers and directors the following: In FY 95, $100,000 (all to Mrs. Madison); in FY 96, $150,000 (of which $100,000 was paid to Mrs. Madison); in FY 97, $165,508 (all to Mrs. Madison); in FY 98, $239,402 (of which $177,000 was paid to Mrs. Madison); in FY 99, $200,000 (of which $125,000 was paid to Mrs. Madison). Each of these forms listed by name other corporate officers and stated that those officers received no compensation.[42] The implication is that the difference was paid to directors, but the difference is unexplained in the record before us.

CCFS made interest-free loans to several employees.[43] Most significant among those was a loan of $10,396.15 to John Madison, Jr., the son of John Madison, Sr. and the stepson of Mrs. Madison. He was an employee of CCFS at the time of the loan. According to the independent auditor, CCFS's books reflected this as a "no interest" loan made May 18, 1999. The auditors listed this loan, describing it as a related party loan, on its FY 99 report as a "reportable condition" because IRS regulations require that interest be charged on a loan exceeding $10,000. The Madisons testified that the loan was made to John Madison, Jr. to pay off a student loan and to foreclose

---

[42] For example, Ida Porter, William Davis and Vivian Braxton were listed, respectively, as President, Secretary, and Treasurer on the Form 990s for 1995, 1996, and 1997. For 1998 and 1999, R.T. Joyner, William Davis, and Vivian Braxton were listed as President, Secretary, and Treasurer.

[43] At the October 4, 2000 Board meeting, the Board approved and ratified student loans made previously to Ingrid Warren, Kendal Robinson, and John Madison, Jr.

garnishment proceedings. CCFS does not dispute the facts surrounding this loan, but states that interest including retroactive interest "was eventually charged" to John Madison, Jr. and that he repaid the loan in full including all interest.

The Attorney General has pointed out a number of expenditures made by the corporations which he alleges involve substantial benefit to the Madisons, their family, and other persons employed by or controlling the corporations, including primarily personal expenses. These include travel expenses, particularly trips to London and Hawaii. In specific, the Attorney General's statement was, "Madison paid her personal credit card with corporate money. These bills amounted to and included foreign trips." The corporations disputed this statement of facts and challenged the documents relied upon as unauthenticated and inadmissible. In their brief, the corporations state:

> The Attorney General also complained of trips taken by the executive director and her family and purchases made on these trips. The independent auditors had already questioned these amounts, however, and required inclusion of these amounts as payroll and compensation expenses, thus requiring the individuals to pay income tax on the expenditures.

Although not at the citation to the record provided by the corporations, we have found documentation for this statement. In an Engagement Memo dated June 30, 1999, the independent auditor noted that there had been several instances where CCFS paid for personal expenses or trips that had no business purpose. The auditor fixed this problem by adding the value of the personal expenses to the salary or compensation of the employee who received the benefit. The working papers and other records indicate that CCFS paid for travel to Hawaii in August of 1997 by Mrs. Madison; her assistant, Dilworth Weathers; Cedric Herring, an employee and Mrs. Madison's nephew; Cris Daugherty and Chaun Daugherty, Mrs. Madison's children and employees of CCFS. CCFS also paid for personal travel in January, 1998, for Mrs. Madison; her assistant Dilworth Weathers; Cedric Herring; Cris Daugherty; Chaun Daugherty; and William Davis, Mrs. Madison's father. Again, in May of 1998, Mrs. Madison, Dilworth Weathers, Cedric Herring, Cris Daugherty, Yolanda Herring, and William Davis traveled to London, and CCFS paid those expenses, even though it was not a business trip, for a total cost of $24,109. The worksheets indicate that the seven employees received a bonus in the amount of $3,971.10, which was to be added to their W-2s, and Mr. Davis, not an employee but a board member, would receive a W-2 in the same amount.

Even though the individuals may have been required to report this corporate benefit as income and pay taxes on it, it is clear that these personal expenditures, unrelated to any business or charitable purpose, were originally and finally paid for by the corporation. The individuals were not required to reimburse the nonprofit public benefit corporation.[44] There was no control over the original expenditure to prevent the corporation from paying for personal expenses. It would appear

---

[44] It is not clear that these "bonuses" were included in the corporations' report of compensation to Mrs. Madison and other officers or directors.

CCFS paid for whatever Mrs. Madison directed, and the accountant, her husband, issued the checks without question.

## E. Real Estate Leasing

During the life of these corporations, they used and operated out of properties owned by Mrs. Madison or the Madisons. Mrs. Madison held a real estate license since 1988 and changed affiliate brokers several times. She used entities entitled Affordable Homes and/or Affordable Homes Management, Inc. to operate her rental property and/or to collect rent therefrom.[45] CCFS, and eventually CCN, entered into lease arrangements with these and other entities for real property owned by the Madisons. As Executive Director of CCFS and CCN, Mrs. Madison was responsible for signing and executing leases on behalf of the corporations. CCFS has used various properties in Memphis owned by the Madisons, including the following: (1) 1647 Semmes; (2) 2414 Lamar Avenue; (3) 4280 Cherry Center Drive ("Cherry Center"); and (4) 2771 Colony Park Drive ("Colony Park"). The most significant transactions involve two of these properties: Cherry Center and Colony Park.

## (1) Cherry Center

The principal place of business for CCFS has been Cherry Center since 1995. CCN used the same location as its principal office upon its inception. The minutes of a March 17, 1995 Board meeting indicate that Mrs. Madison informed the Board of the "prospect" of moving the main office of CCFS to another location due to the need for additional space. She informed the Board the new location would provide approximately three times the space and the rent would be approximately three times the amount then paid. The Board approved the move.

Shortly after this meeting, in April of 1995, the Madisons bought Cherry Center, an approximately 9,700 square foot building, for $275,668. Less that two weeks later, CCFS entered into a five-year lease for the building beginning on May 1, 1995, and ending on June 30, 2000. The lease provided for annual rent in the amount of $49,932.[46] The Lessor was listed as Lew Harris & Associates, a real estate brokerage firm with whom Mrs. Madison was affiliated. Mrs. Madison signed the lease on behalf of CCFS as lessee.

Between July 1, 1995, and June 30, 1996, the Cherry Center lease was renegotiated. The five year term remained, except it was set to run from July 1, 1995, through June 30, 2000. The new lease provided for annual rent of $72,000.[47] Again, the lessor was Lew Harris & Associates, and Mrs. Madison signed on behalf of the lessee. The rent increase was retroactive.

---

[45] CCFS describes these entities as a d/b/a account.

[46] The total rent over the five year period would amount to $257,982.

[47] The total rent under this lease for the five year term would amount to $360,000.

The lease for the Cherry Center office space was renegotiated a second time prior to its expiration. The new renegotiated lease was between CCFS and Affordable Homes a/k/a Affordable Properties Management. Mrs. Madison signed for the lessee; no signature appears for the lessor. The lease term was from July 1, 1998, to June 30, 2000, and reflected an increase in the per square foot rental rate as well as the calculated square footage of the building. Although the building only had approximately 9,700[48] square feet, the lease reflects that CCFS leased 20,000 square feet. The changes resulted in an annual rent increase from $72,000 to $210,000.

Three members of the Board of Directors[49] approved a resolution dated March 22, 1999, authorizing the payment of "prorated back rent" for the contract period on the Cherry Center space. The resolution indicates that $228,000 had already been paid ($6,000 per month x 38 months). A calculation reflected "what would have been paid" by multiplying the 38 months by the $17,500 per month rental in the newly renegotiated lease, for a total of $665,000. The "What We Owe" column calculated the difference as $437,000. Accordingly, Affordable Homes received a payment of $437,000 for back rent not due, based upon rental rates per square foot not in effect during the 38 months in question, and based upon a square footage estimate which was not occupied by CCFS during that 38 months. Under the second renegotiated lease and the "pro rated back rent" resolution, the Madisons would have received $1,085,000 for the five year lease from May, 1995 through June 30, 2000.

On May 29, 2000, a Memphis newspaper, *The Commercial Appeal*, publicly disclosed that the square footage originally reported to be in the building at Cherry Center was overstated. Mrs. Madison then sent a letter to DHS purporting to inform DHS of a rent miscalculation at Cherry Center because the actual square footage at Cherry Center was different from that stated in the lease. At this point in time, CCFS was operating under the reimbursement contract and had been receiving payments from DHS based, in part, on the rental paid for the incorrect square footage. Mrs. Madison stated that she and the Board members of CCFS had already negotiated a new rental agreement with their lessor (who was, of course, the Madisons). DHS was already aware of the square footage miscalculation. CCFS subsequently paid $50,000 back to DHS for amounts received as a result of the miscalculation in square footage.

After the true square footage was discovered, the lease for the Cherry Center office space was renegotiated a third time prior to its expiration. The lessor on the third lease was One Source

_____

[48]The 9,700 square feet included a swimming pool and a theater, and only 7,680 square feet of office space.

[49]Roosevelt T. Joyner, Vivian Braxton, and William Davis signed the resolution. Because Mrs. Madison was, in essence, Affordable Homes and received the money paid as back rent, the transaction is clearly a conflict of interest transaction. Because of his relationship with Mrs. Madison, Mr. Davis had an indirect interest in the transaction awarding his daughter's company back rent. Thus, it appears doubtful that the resolution approving the $437,000 payment met the approval requirement of Tenn. Code Ann. § 48-58-302(d) that a majority of disinterested board members approve such a transaction after full disclosure.

Commercial, Inc.[50] instead of Affordable Homes a/k/a Affordable Properties Management. Mrs. Madison had employed this company, with which she was otherwise unrelated, to collect rents on properties owned by her including Cherry Center and 2771 Colony Park. The new term of the lease was from January 1, 2000, to December 31, 2000. The renegotiated lease reflected the actual square footage of Cherry Center, approximately 9,700 square feet. As a result, the annual rent on Cherry Center was reduced from $210,000 to $102,327.

In a series of meetings in August through October, 2000, the new Board of Directors reviewed certain prior transactions of CCFS, including its rental arrangements with the Madisons. Minutes of the August 3, 2000 meeting reflect the following:

> Specifically the Board reviewed the amount of rent paid by Cherokee since May of 1995. Based upon calculations prepared by staff and attorneys for the Corporation, it appears that Cherokee may have overpaid Affordable Homes $502,838.00 in rent for this period. In the prior meeting the Board discussed various options for Affordable Homes and/or WillieAnn Madison repaying this amount in rent overpayment to Cherokee.

The Board adopted a resolution stating that CCFS had overpaid $502,838 in rent and that this amount represented a debt due from Mr. and Mrs. Madison to CCFS. The resolution gave the Madisons the option of conveying the Cherry Center building to CCFS, provided it appraised at not less than the amount due, or to pay the amount due. At its October 18, 2000 meeting wherein the Board reviewed all prior audits with its attorney, it discussed the retroactive rent increases disclosed in the 1999 audit report, but "determined that it had already taken appropriate corrective action."

On October 17, 2000, WillieAnn Madison executed a deed transferring her interest in Cherry Center to CCFS and paid it $32,838. Sometime thereafter, John Madison executed the deed. The deed was recorded on October 31, 2000. As reflected in the Board minutes, the transfer of Cherry Center was intended to repay CCFS for prior rent overpayment in the amount of $502,838.

With regard to the lease arrangements with Affordable Homes, Rev. Joyner testified that the original arrangement was in effect when he came on the board and, at that time, he did not know who the rent was being paid to, and that he still did not know who were the principals of Affordable Homes. He knew that the Madisons owned the property, but never asked who Affordable Homes was. He testified that he initiated the resolution on the rent increase, called two Board members, and got them to sign the resolution along with him.

With regard to increasing CCFS's rent during the term of the lease and making the increase retroactive, Rev. Joyner could not say how it would be in the corporation's best interest, but he had not thought it was contrary to the corporation's interest or would harm it in any way. He just thought

---

[50]The name actually appears on the lease as Source One Management Corporation, a mistake.

it was fair, that CCFS should pay its fair share of rent, and that the rental amount had been less than fair market value before it was increased.

Rev. Ware testified he was not present at a meeting where the Board voted to increase the rent at Cherry Center. He did not recall signing a resolution authorizing it or exactly what transpired. He did not know who owned Affordable Homes or whether Affordable Homes ever owned the real property. When presented with the transaction later, he did not ask whether the figures were correct, "All I did was when they presented it I said yes." He testified he was not required to make an independent determination on whether the particular transaction was in the best interest of the corporation. He felt it was in order for the Board to increase the rent and make that rent retroactive because the rate per square foot was lower than other properties in the area. He testified that the only benefit to the corporation from this transaction was that the corporation would be in a better cash flow position because DHS reimbursed costs under the new arrangement. He stated he never gave much thought to the benefit to the corporation from the retroactive payment. He knew the $437,000 paid for retroactive rent increase went to Affordable Homes, but did not know if the money ultimately went to the Madisons. "I didn't question that, I didn't investigate that."

Ida Porter testified that she had heard that Mrs. Madison owned Cherry Center. She guessed that CCFS was paying rent to Mrs. Madison for the building. She did not recall the Board ever voting to lease the property from Mrs. Madison. In her opinion, that decision would have had to have been made by the chairman of the Board, who at that time was Rev. Joyner. She did not recall the Board passing a resolution to increase the amount of rent paid to Mrs. Madison for Cherry Center. She testified that she did not know anything about a decision to increase rental payments before the expiration of the lease.

Mr. Davis testified that when approving the retroactive rent increase, he thought it was appropriate that he, as a director, act in his daughter's best interest because, to him, the interests of the corporation and those of Mrs. Madison were the same.

(2) Colony Park

A few weeks before the March 22, 1999 resolution to pay "prorated back rent," the Board met on March 5, and the minutes reflect a discussion of the need for additional space beyond that occupied in the Cherry Center. The minutes reflect that Mrs. Madison reported a need to acquire more office space across the street, and explained what offices or functions would be moved. "The Board suggested that she look into leasing additional space." Across the street from the Cherry Center were buildings known as Colony Park. At the time this need for more space was brought to the Board, Colony Park was owned by someone else. That situation soon changed.

Approximately two weeks after CCFS approved the resolution giving Affordable Homes $437,000 in "prorated back rent," the Madisons purchased 2771 Colony Park Drive ("Colony Park") and four other parcels of real property including 2755, 2759, 2763, and 2768 Colony Park Drive for

approximately \$1,083,500.[51]  In May of 1999, the Madisons transferred one of the parcels to Rev. Joyner, one of the members of the Board of Directors who signed the \$437,000 resolution.[52]

Rev. Joyner explained the transaction, stating he went to the auction where all the parcels in Colony Park were sold.  He intended to purchase 2755 Colony Park, but was unsuccessful because he could not bid on all the parcels.  The Madisons, however, successfully bid on all the parcels and acquired them.  They paid \$250,000 for the parcel identified as 2755 Colony Park, and sold it to him for \$300,000.

A little over a month after the purchase, CCFS entered into a one-year lease, beginning June 1, 1999, and ending July 30, 2000, with Affordable Homes a/k/a Affordable Properties Management for office space at 2771 Colony Park.  The annual rent on the property was \$31,530.[53]  CCFS renegotiated the lease for the Colony Park property on July 20, 2000.  The term was extended from July 30, 2000, to December 31, 2000.  The annual rent on the property increased from \$31,530 to \$44,961.

CCN also entered into a lease for office space at 2771 Colony Park from Affordable Properties Management for a one-year term beginning June 1, 1999, and ending July 30, 2000.  The annual rent on the property pursuant to the lease was \$36,785.  That lease is for 3,003 square feet of space; nothing in the record indicates the square footage leased by CCFS or the total amount of square footage in the building.

Colony Park was in a state of disrepair when it was purchased by the Madisons.  There were leaks in the roof and repairs were needed to correct problems with the floor and the ceiling.  Under the terms of the leases, CCFS and CCN were responsible for maintenance and repairs at Cherry Center and Colony Park.  The record is not clear as to who paid for initial substantial repairs and improvements.

F.  Investment of CCFS and CCN Funds

MemphisFirst Corporation ("MFC") and MemphisFirst Community Bank ("MFCB") were chartered in 1999 by the State of Tennessee.  MFCB is a wholly owned subsidiary of MFC, a bank holding company.  Mrs. Madison is an incorporator and member of the Board of Directors for MFCB

---

[51]The purchase occurred on April 5, 1999.

[52]On July 2, 1999, the Madisons also conveyed 2759 Colony Park Drive to Phyliss Herring, the sister of Mrs. Madison, for \$300,000.

[53]Although CCFS and CCN do not dispute the existence of the lease for Colony Park or the terms thereof, they object to the exhibits relied upon by the Attorney General in alleging these facts. While the first reference to the lease is to a document filed apparently without a supporting document, the lease in question actually appears several places in the record, including as an attachment to an affidavit from a DHS official certifying that CCFS filed the lease in support of its application for reimbursement.

and a member of the Board of Directors for MFC. Mrs. Madison is also an investor in MFC because, as a director, she is required to own at least 1% of the stock. She and her family members have made significant investments in MFC common stock.[54] Rev. Joyner, a CCFS Board member, was also a member of the Board of both the bank and the holding company. He was also a shareholder, having purchased $100,000 of stock initially. He described Mrs. Madison and himself as founders of the bank.[55]

Rev. Joyner testified he discussed investment in the bank by CCFS by telephone with Rev. Ware, Ms. Braxton, Mr. Davis, and Mrs. Madison. On September 10, 1998, Rev. Joyner, C.E. Ware, and Vivian Braxton signed a resolution authorizing CCFS to purchase $190,000 in stock from MFC at $10 per share.[56] They also signed a resolution authorizing CCN to purchase $110,000 of stock from MFC at $10 per share. During fiscal years 1998 and 1999, according to the auditor, the corporations invested approximately $300,000 to purchase 30,000 shares of common stock issued by MFC. According to the receiver and the bank, CCFS owned 19,000 shares, and CCN owned 11,000.[57] The stock of MFC is not traded on the stock exchange or an open market. The corporations assert, however, that there is a market for the stock and that it can be readily sold and traded.

Rev. Ware testified he was not present at the meeting where the Board approved the investment in the bank, but he knew about it at the next meeting and "never did ask the questions of the exact amount." He identified the resolution approving purchase of stock in the bank including his signature and that of Rev. Joyner, Ms. Braxton, and Mrs. Madison. He had said a quorum was four people, since the Board had seven members. Mrs. Madison was not a member of the Board, so the resolution was approved by three Board members, one of whom had a financial interest in the bank and served on its board.[58]

## G. Action Taken by Individual Board Members of CCFS and CCN

The testimony of several Board members demonstrates that they were less than vigilant or probing in examining corporate activities and in remaining knowledgeable about the corporation. They relied upon Mrs. Madison for information and recommendations and generally did not question

---

[54]This statement of fact was undisputed by the corporations.

[55]Darrell Thomas was also a member of the boards of both the bank and the holding company. He became a member of the Board of CCFS in 1999, apparently after the decision to invest in the bank.

[56]Mrs. Madison signed the resolution as a witness in her capacity as executive director.

[57]According to the corporations' brief, CCFS made the entire purchase, and 19,000 shares were titled in the name of CCFS, while 11,000 shares were titled in the name of CCN "and donated to that entity."

[58]The investment decision was clearly a conflict of interest transaction because of Mrs. Madison's and Rev. Joyner's involvement with the bank. Approval by the board for such a transaction requires approval by a majority of the members of the board who have no direct or indirect interest in the transaction. Tenn. Code Ann. § 48-58-303(d).

her recommendations. For example, Rev. Ware testified he did not know if Mrs. Madison was being compensated by both corporations, or by one on behalf of both, and he did not inquire into it. He also testified that he was not aware of the financial condition or resources of CCFS; he did not look at financial statements; he had not ever looked into the financial condition of the corporation. The testimony of several Board members indicates their lack of knowledge of the duties imposed by law upon corporate directors.

The Board was reconstituted due to some resignations.[59] As discussed earlier, this "new" Board, in the fall of 2000, reviewed some previous corporate transactions and retroactively approved many of them. In addition, the "new" Board, in October of 2000, provided indemnification for Mrs. Madison's legal defense.

The Board had adopted new bylaws on August 3, 2000. Mr. Mosley, Mr. Thomas, Rev. Ware, and Mrs. Porter were the directors in attendance. Those bylaws included a provision allowing the corporation to indemnify officers and directors in accordance with Tenn. Code Ann. § 48-58-507.[60] The minutes of an October 18, 2000 meeting reflect that because the corporation's attorney could not also represent Mrs. Madison, the Board voted unanimously[61] to indemnify Mrs. Madison for legal fees for her separate attorney, A.C. Wharton.[62] The decision was based, in part, on the fact that the corporation had provided legal expenses to Board members.

At a later meeting, the board reaffirmed the indemnification and approved a written indemnification agreement. The minutes reflect that the Board had previously examined all transactions questioned by the State in working with its attorneys to prepare for all the litigation and in preparing for Grand Jury testimony, and the Board determined that the members knew of no facts that would preclude indemnification of Mrs. Madison. Present at that meeting were Mr. Mosley, Mr.

---

[59]Vivian Braxton and Donna Graves resigned from the Board on November 30, 1999, and Darrell Thomas was elected secretary. Rev. Joyner resigned on March 23, 2000, and Mrs. Porter agreed to act as chairman of the board. On May 30, 2000, the Board voted to accept Clarence Mosley as a member, and he was later elected chairman.

[60]That provision allows indemnification of an officer, to the same extent of a director, for expenses, including counsel fees, incurred with respect to "any threatened, pending, or completed action, suit or proceeding whether civil, criminal, administrative, or investigative and whether formal or informal." Tenn. Code Ann. § 48-28-501(7). A corporation may indemnify a director made a party to such a proceeding because of his status as director, if: (1) the individual acted in good faith; (2) if the conduct was in the capacity of corporate director, the individual reasonably believed that his or her conduct was in the corporation's best interest and, if the conduct was not made in the capacity of a corporate director, that the conduct at least was not opposed to the corporation's best interests; and (3) in the case of any criminal proceeding, the individual had no reasonable cause to believe the individual's conduct was unlawful. Tenn. Code Ann. § 45-58-502(a).

[61]Attending the meeting were Mr. Mosley, Mr. Thomas, Rev. Ware and Mrs. Porter.

[62]The new bylaws provide that any indemnification shall be made by the corporation only upon a determination in a specific case that indemnification is proper because the officer or director has met the applicable standard of conduct. Such determination is required to be made by a majority vote of a quorum consisting of members who were not parties to such action or proceeding or, if no such quorum is obtainable, by independent legal counsel or by the members.

Thomas, Rev. Ware and Mrs. Porter. The written indemnity agreement includes a provision requiring Mrs. Madison to repay any expenses advanced by the corporation if it is ultimately determined that she is not entitled to indemnification. The agreement references two lawsuits brought by the State, including this one, and a grand jury investigation into the day care industry in Shelby County.

As part of his argument that the corporations are unable to carry on their charitable purposes, the Attorney General asserts that this indemnity agreement is unlawful because: (1) it was not included in the budget approved by the trial court; and (2) it does not comply with the statute. The Attorney General alleges various procedural defects in the approval of indemnity, but the Board made the requisite findings in its November 17, 2000 meeting where it approved the actual agreement.

In the main, the Attorney General asserts that Mrs. Madison is not entitled to indemnity. Under the relevant statutes, indemnity is not available "in connection with any other proceeding charging improper personal benefit to the director [or officer], whether or not involving action in the director's [or officer's] official capacity, in which the director was adjudged liable on the basis that personal benefit was improperly received by the director." Tenn. Code Ann. § 48-58-502(d)(2). In addition, no indemnification may be made to a director or officer if a judgment adverse to that individual establishes his or her liability for: (1) breach of the duty of loyalty; (2) acts or omissions not in good faith; or (3) for unlawful distributions pursuant to Tenn. Code Ann. § 48-58-304. Tenn. Code Ann. § 48-58-509(a).

While we agree that the complaint seeking dissolution of the corporations alleged that personal benefit and unlawful distributions were received by Mrs. Madison and, at least impliedly, that she breached her duty of loyalty to the corporations, this lawsuit does not directly raise the issue of potential personal liability of Mrs. Madison. Neither the trial court nor this court has been called upon to adjudge her personally liable.

Because CCFS conditioned its advance of expenses for counsel upon repayment if it is later determined Mrs. Madison was not entitled to indemnification, we cannot agree with the Attorney General that the action of the Board in indemnifying Mrs. Madison upon advice of corporate counsel who was faced with the potential of representing clients with conflicting interests is an illegal action or that it is another example of misapplication of funds.

We are concerned, however, that actual payment of advances for attorney fees may violate the trial court's order which was in place at the time of the indemnification agreement. Further, after the trial court's appointment of a receiver, any expenditures by the corporations would be subject to the receiver's and the court's approval. Consequently, we conclude that the issue of whether payment of advances can actually be made should be determined by the trial court.

## VI. The Determinative Issue - Private Gain or Public Good

On appeal, the corporations argue that the trial court erred in denying their motion for summary judgment and also erred in granting the Attorney General's motion. In particular, they assert that the Attorney General failed to establish undisputed proof of, and that the corporations conclusively negated, allegations that the corporations had conducted business in a persistently fraudulent or illegal manner. CCFS takes the position that the Attorney General failed to prove fraud because he failed to show: (1) that the corporations made any intentional misrepresentation; (2) failed to disclose a material fact when under a duty to do so;[63] or (3) that anyone reasonably relied on any misrepresentations and was injured because of that reliance.

The corporations take the same position with regard to the ground alleging corporate assets were wasted or misapplied. That is, they assert that the Attorney General failed to prove and the corporations conclusively negated the existence of such statutory grounds and assert that the Attorney General had argued that the crux of his case was that non-profit assets had been diverted through a series of self-dealing transactions. First, the corporations argue that all of the assertions of waste and misapplication involved only matters and transactions that had occurred in the past, but that the relevant statute, Tenn. Code Ann. § 48-64-301(a)(1)(E), uses the present tense and requires proof that assets "are being misapplied or wasted." CCFS argues that "[t]his language makes clear that the statute is designed to prevent the risk of current waste or misapplication." According to the corporations' argument, the current board of directors has made diligent and prudent efforts to preserve corporate assets and to address and correct past acts complained of by the Attorney General and there was no proof that assets are currently being misapplied or wasted.

The corporations also assert that the evidence was insufficient to establish waste or misapplication of assets as a matter of law, even with regard to past operation. In particular, the corporations assert that none of the alleged conflict of interest or self-dealing transactions were shown to be unfair to the corporation; that the Board approved and/or later ratified all the transactions; that the transactions, including the compensation paid to the executive director and her husband, were reasonable, or that the reasonableness thereof is a matter of disputed fact; and that personal expenditures for trips and purchases originally paid for by CCFS were eventually charged to the employees as additional compensation.

It is not necessary for this court to address the corporations' arguments regarding the sufficiency of the proof of fraudulent or illegal operations; neither must we address the arguments as to whether specific transactions constituted a waste or misapplication of assets. We are of the opinion that the trial court correctly recognized the central issue in this case: whether the corporations complied with the requirements of nonprofit public benefit corporations in fulfilling their charitable or nonprofit purposes, or whether they were operated for private financial gain. To the extent the corporations were operated for private gain, their assets were misapplied. Thus, the

---

[63]CCFS contends that all related party, conflict of interest, or similar transactions were disclosed to its independent auditor, who reported them in its audits.

question is whether the undisputed facts demonstrate that CCFS and CCN were operated for the private benefit of Mrs. Madison, her family, or other corporate insiders.

A review of the record, specifically the facts as set out above, leads to the inevitable conclusion that the corporations were operated for the private gain of Mrs. Madison, her family, and/or other individuals in control of the corporations. The facts demonstrate a consistent pattern of disregard of the corporations as separate entities from Mrs. Madison. They also demonstrate a disregard of the fundamental nature of a nonprofit public benefit corporation.

Even based on the figures provided by the corporations, although they are not entirely reconcilable, Mrs. Madison was paid a substantial salary, but was regularly awarded bonuses of 50% or more of her stated salary. Corporate records and corporate memory are ambiguous about the exact amounts so paid, although several $50,000 bonuses were awarded her. The corporations' inexact records on this issue simply demonstrate the inattention paid to distributions to Mrs. Madison by anyone other than Mrs. Madison. Although the corporations attempt to justify the raises in salary and the large bonuses as merited by the success of the program, including the financial success, that argument misses the point. The goal of a nonprofit public benefit corporation is not to generate profit; neither is it to reduce its "profit" or excess revenues by increasing operating expenses which enrich corporate insiders. Excess revenues are intended to be used to further the charitable or public benefit mission of the corporation. We do not imply that a public benefit corporation cannot reward its officers with salary increases or other compensation if that compensation is reasonable. Although the corporations argue vehemently that they proved that Mrs. Madison's salary was reasonable, that proof was related to her 2000 salary disclosed as $125,000, an amount the corporations describe as the highest salary level she reached. We find no proof to support an argument that regular yearly grants of additional compensation of 50% or more of her salary[64] is reasonable. In any event, it is not a question of whether any particular amount was proven to be reasonable or unreasonable. Rather, the apparently cavalier way in which the corporation regularly gave its creator and executive director significant "additional compensation" plus her also increasing salary demonstrates to us that the corporations' assets were treated as a ready source of economic benefit to an individual.

Another example of the manner in which the corporate resources were used involves payment for personal expenses. Mrs. Madison freely used corporate funds for personal expenses for herself and her family, such as the travel described earlier. In those instances, no one in the corporation apparently questioned the original payment of the expenses by the corporation, and the corporation was never repaid, even though there is no dispute that the trips had no business purpose.

The use of corporate revenue for private gain is dramatically exemplified in the real estate and leasing transactions. Twice Mrs. Madison informed the Board that CCFS needed additional

---

[64]If we accept the corporations' statement that Mrs. Madison continuously received salary increases reaching a salary of $125,000 by the year 2000, the corporations' statement that her compensation in FY 98-99 was $125,000, and the corporate records that she was awarded a $50,000 bonus in December of 1998, we must conclude that her salary was less than $100,000 prior to FY 1999-2000.

space, then purchased real property meeting that need, and leased that real property to the corporations. She made the second purchase, Colony Park, shortly after CCFS had paid her $437,000 in "prorated back rent" for use over the past 38 months of 20,000 square feet of space when CCFS could not have occupied that amount of space during that time, at a higher rate per square foot than CCFS had contracted to pay for that 38 months, and after the rate per square foot had already been increased during the term of the lease. Members of the Board who approved this payment were unable to explain how this payment could have been in the corporation's interest. The new Board concluded that Mrs. Madison and her husband had been overpaid in rent from May 1995 in the amount of $502,838. Thus, it is obvious that the new Board did not consider the prorated back rent payment, or apparently other rental amounts, to be fair to the corporation. More significantly, the new Board obviously determined the rent "overpayment" to have been an inappropriate expense the corporation should not have paid.

The leasing by the corporations of space owned by the Madisons raises significant questions because, among other things, the record does not indicate any attempt to locate other space or compare rental amounts. The increases in rent during the terms of the leases are difficult to justify as being in the interest of the corporations and are unjustified in the record before us. Even these decisions, however, pale in comparison to the remarkable act of giving Mrs. Madison, or her company, $437,000 on the basis of "prorated back rent" which the corporations were clearly not liable for. There is no clearer example of the total disregard exhibited toward the interests of the corporations and the furtherance of its public benefit mission.

The investment of substantial sums in a bank in which Mrs. Madison, her family, and a Board member had a substantial financial interest, and on whose board Mrs. Madison and the CCFS Board member sat, also demonstrates a disregard of the legal requirements for such transactions. Those requirements exist, in part, to protect the nonprofit corporation's assets and to avoid insider economic benefit. Once again, those in control of the corporations abandoned their duty to see that these assets were used to further the corporations' public benefit mission.

These circumstances as well as others demonstrate a failure of those in control of the corporations to ensure adherence to the basic requirement of a nonprofit public benefit entity: that it be operated exclusively for a charitable purpose, that it serve a public rather than a private interest, and that its income or assets not be distributed to individuals in control of the entity. The corporations herein fail the test of whether they have been operating as true nonprofit corporations, "whether the corporation is being exploited for direct monetary gain." FLETCHER, *supra*, at § 68.05. The trial court determined that the corporations had abandoned any public or charitable purposes and had pursued private interests. Our independent review of the record fully supports that conclusion.

## VII. The Business Judgment Rule

While we need not specifically address some of the issues raised by the corporations because they relate to grounds other than the one we find determinative, there remains one argument which we interpret as a general defense to dissolution. In essence, the corporations argue that they

established a defense to many of the Attorney General's allegations because the directors' judgment with respect to the challenged financial transactions was insulated from "second-guessing" by the business judgment rule. Essentially, the corporations argue that decisions by the Board regarding compensation, payment of expenses, investment, leasing, etc. are committed to the sound discretion of the Board and should not be second-guessed by the courts.

Tennessee courts recognize and follow the business judgment rule in certain circumstances. This court has explained the underpinnings of the rule as follows:

> Tennessee's courts have consistently followed a noninterventionist policy with regard to internal corporate matters. They have recognized that directors have broad management discretion. *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988) (discretion in employing or discharging corporate officers); *Wallace v. Lincoln Sav. Bank*, 89 Tenn. 630, 636, 15 S.W. 448, 449-50 (1891). Accordingly, they have declined to substitute their judgment for that of a corporation's board of directors when the board has acted in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *French v. Appalachian Elec. Coop.*, 580 S.W.2d 565, 570 (Tenn. Ct. App. 1978); *Range v. Tennessee Burley Tobacco Growers Ass'n*, 41 Tenn. App. 667, 675, 298 S.W.2d 545, 549 (1955), cert. denied, 355 U.S. 813, 2 L. Ed. 2d 30, 78 S. Ct. 11 (1958).

*Lewis v. Boyd*, 838 S.W.2d 215, 220 (Tenn. Ct. App. 1992).

Where it applies, the business judgment rule is a presumption that a corporation's directors, when making a business decision, acted on an informed basis, in good faith, and with the honest belief that their decision was in the corporation's best interest. *Id*. The rule does not apply where there is no conscious decision by board members to act or refrain from acting. *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001). The rule does not apply when the director or officer has an interest in the decision, did not actually make a decision, or made an uniformed decision. *Lewis*, 838 S.W.2d at 220-21; *Hall*, 1996 Tenn. App. LEXIS 384, at *19-*20; 3A FLETCHER, *supra*, at § 1036.[65]

As some courts have held, the business judgment rule "extends only as far as the reasons which justify its existence." *Resolution Trust Corp. v. Acton*, 844 F. Supp. 307, 314 (N.D. Tex. 1994) (quoting *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982), *cert. denied*, 460 U.S. 1051, 103 S. Ct. 1498 (1983)). Because of the reasons for its creation, the rule does not apply to decisions which breach the duty of loyalty. The business judgment rule was developed by the courts to protect corporate management from liability for mistakes in business judgment. 5 FLETCHER, *supra*, at § 2104. Thus, the duty of care is implicated, not the duty of loyalty.

---

[65]Based on these criteria, it is arguable, and the Attorney General has argued, that the actions by the original boards in approving the various challenged transactions do not qualify for the protection of the business judgment rule.

> The business judgment rule developed concurrently with the duty of care. In fact, the cases in which courts originally articulated the duty of care also discussed the business judgment of directors and officers. Many of these early cases simply stated that directors and officers were not liable for honest mistakes or errors of judgment. Other cases held that directors and officers incurred liability only for errors "of the grossest kind." Several courts and commentators have articulated their own formulations of the business judgment rule. The rule basically states that if any rational business purpose exists for directors' or officers' decisions, they are not liable for errors in judgment when their decisions result in an unfavorable outcome for the corporation. . . .

Thomas A. D'Ambrosio, et al, *Special Project: Director and Officer Liability*, 40 VAND. L. REV. 599, 614-15 (April 1987).

Because the rule was developed to analyze duty of care issues, "courts do not typically apply the business judgment rule to duty of loyalty issues." *Hall*, 1996 Tenn. App. LEXIS 384, at \*20. *See also* 3 FLETCHER, *supra*, at § 837.60 (stating that generally, the rule does not apply where there is a breach of the duty of loyalty).

> . . . if the directors or officers are unable to prove full disclosure or fairness, they may be liable in damages or the court may rescind the transaction. The business judgment rule provides no shelter for directors and officers who breach the duty of loyalty.

D'Ambrosio, *supra*, at 628. *See also* Brody, *supra*, at 1424-25 (stating that the business judgment rule is used in reviewing directors' duty of care and insulates directors from liability for mistakes in judgment exercised without divided loyalty). As explained earlier in this opinion, a director's duty to ensure that a nonprofit public benefit corporation operate so as to further its public interest purpose is part of the duty of loyalty.

The business judgment rule has application as a potential defense in two situations: (1) where officers or directors face personal liability; and (2) where the corporation (generally through shareholders in a derivative action) seeks to void a decision of or transaction approved by the board. Neither situation is present herein. The Attorney General does not seek monetary damages from any member of the board for breach of fiduciary duties. Neither does he seek to set aside or invalidate any particular transaction. Instead, this action is maintained under Tenn. Code Ann. § 48-64-301 under which the Attorney General is authorized to act in the public interest to ensure that a nonprofit public benefit corporation is not operated for private gain.

Thus, although the business judgment rule is generally applicable to nonprofit corporations, *see Burke v. Tennessee Walking Horse Breeders' and Exhibitors' Association*, No. 01A01-9611-CH-00511, 1997 Tenn. App. LEXIS 378 (Tenn. Ct. App. May 28, 1997) (no Tenn. R. App. P. 11 application filed); 5 FLETCHER, *supra*, at § 2104, it is not a defense to dissolution for misapplication

of corporate assets by operating for private gain. Although directors of nonprofit corporations may be entitled to the protection of the business judgment rule in some situations,

> Nevertheless, charitable or nonprofit corporations are generally subject to statutory supervisory authority of the attorney general, who may institute judicial proceedings for mismanagement by the directors or trustees of the corporation or in exceeding or failing to carry out its charitable or corporate purpose.

5 FLETCHER, *supra*, at § 2104.

We conclude that the business judgment rule has no application to the case before us. While the business judgment rule reflects a judicial policy of declining to substitute a court's judgment for that of a corporation's directors when they have acted in good faith and in the exercise of honest judgment in furtherance of corporate purposes, *French v. Appalachian Elec. Coop.*, 580 S.W.2d 565, 570 (Tenn. Ct. App. 1978), that policy has no application to allegations that a public benefit corporation has abandoned any charitable purpose and has pursued private, rather than public, interests. Similarly, while Tennessee courts have adopted a non-interventionist policy with regard to internal corporate matters, *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 736 (Tenn. Ct. App. 2000), that policy is inapplicable here because the legislature has specifically given the Attorney General and the courts authority and responsibility to ensure that nonprofit public benefit corporations operate in the public interest and not for private gain. The public policy of this state, as expressed by the legislature, is that the Attorney General and the courts intervene in such situations because the public interest is involved and the activities involved are not merely "internal corporate matters."

VIII. Protective Order

During discovery, the corporations sought to depose the Attorney General, Paul Summers, and Paul Givens, an employee of the Comptroller of the Treasury. The Attorney General sought and was granted a protective order against these depositions. The corporations herein appeal from that decision.

The granting or denying of a protective order relative to discovery procedures rests within the sound discretion of the trial court. *Tenn. Dep't of Commerce and Ins. v. FirstTrust Money Servs., Inc.*, 931 S.W.2d 226, 230 (Tenn. Ct. App. 1996). Such a discretionary decision is reviewed for abuse of discretion. *Id.* The burden of establishing abuse of discretion is on the party seeking to overturn the trial court's ruling on appeal. *Ballard v. Herzke*, 924 S.W.2d 652, 659 (Tenn. 1996).

> Under the abuse of discretion standard, a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to the propriety of the decision made.' A trial court abuses its discretion only when it 'applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to

the party complaining.'  The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

The correct standard to be applied in ruling on a motion for protective order is found in Rule 26.03 of the Tennessee Rules of Civil Procedure, which provides in pertinent part:

Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . .

There is nothing in the record before us to indicate that the trial court did not apply this standard.

On appeal, the corporations argue they should have been allowed to depose the Attorney General to test the factual basis for the allegations of fraud, illegal conduct, and waste.  The corporations do not, however, assert that they were unable to obtain information regarding the basis for these allegations from other sources.  They point to no disadvantage they suffered because of the protective orders.  They admitted a number of the facts which are the basis for the complaint and are the basis for the trial court's and this court's decision that the corporations were used for private gain.  We cannot find that the corporations suffered an injustice from the grant of the protective orders.

Consequently, we find that the trial court did not abuse its discretion in granting the protective orders.

## IX. Conclusion

In granting summary judgment, the trial court stated:

. . . the Court has gone over the facts in this case several times, and the Court has considered the affidavits filed by the parties, the memoranda of law filed by the parties, the arguments of counsel in support of their positions.  From all of that, the Court is of the opinion and finds that the Attorney General's motion for summary judgment should be granted and is granted and defendants' motion for summary judgment, for both defendants, those motions for summary judgment are denied. That is to say, that the Attorney General is entitled to have a receiver appointed for these two corporations, and that he's entitled to proceed with dissolution based on the statute, in accordance with the statute . . . .  I also need to say that . . . the Court bases its ruling on the fact that the Court is of the opinion that the defendants have abandoned their public purpose and have devoted their activities toward a private

purpose which the Court finds is not in keeping with the statute pertaining to nonprofit corporations. So for that reason under the statute, the Attorney General has authority to take action in a case like this. He has authority under the statute to supervise nonprofit organizations and, of course, he represents the public interest. . . .

After a careful consideration of the record, we have determined that the trial court was correct in granting summary judgment for the Attorney General, appointing a receiver, and ordering the dissolution of CCFS and CCN. Therefore, we affirm the decision of the trial court and remand the case for any further proceedings consistent with this opinion which may be necessary. The costs of this appeal are taxed to Cherokee Children and Family Services, Inc. and Cherokee Children Nutrition, Inc., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE