IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2015 Session


**STATE OF TENNESSEE EX REL. HERBERT H. SLATERY, III, ATTORNEY GENERAL AND REPORTER v. SENIORTRUST OF FLORIDA, INC.**


**Appeal from the Chancery Court for Davidson County**
**No. 111548III     Ellen H. Lyle, Chancellor**

_____


**No. M2014-02288-COA-R3-CV – Filed December 22, 2015**
_____


The Attorney General brought a judicial dissolution action against two nonprofit public benefit corporations. The main issue in this appeal is the scope of the Attorney General's authority to determine the use of the funds remaining after the dissolution of these two nonprofit corporations and the payment of all of their debts. Finding no abuse of discretion in the trial court's decision to reject the Attorney General's proposed plan for the distribution of the nonprofits' remaining funds, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Herbert H. Slatery, III, Attorney General and Reporter, Joseph F. Whalen, Associate Solicitor General, and Janet M. Kleinfelter, Deputy Attorney General, for the appellant, State of Tennessee.

Carolyn W. Schott, Nashville, Tennessee, for the amicus curiae, Senior Citizens, Inc. d/b/a FiftyForward.

Gary Housepian and David Kozlowski, Nashville, Tennessee, for the amicus curiae, Legal Aid Society of Middle Tennessee and the Cumberlands.

Claiborne K. McLemore, III, Nashville, Tennessee, for the amicus curiae, The West End Home Foundation, Inc.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

In July of 2000, SeniorTrust of Florida, Inc., was incorporated as a Tennessee nonprofit public benefit corporation by William Richmond. In August 2000, Mr. Richmond incorporated ElderTrust of Florida, Inc., as a Tennessee nonprofit public benefit corporation. As stated in their charters, the purpose of these two nonprofit corporations was to "establish, acquire, own, maintain and operate hospitals, nursing homes and related healthcare facilities, including retirement housing for elderly persons." Mr. Richmond was a substantial shareholder in National Healthcare Corporation, Inc. ("NHC"), and National Health Investors, Inc. ("NHI").

In 2001, SeniorTrust and ElderTrust acquired several nursing homes from NHI using financing from NHI secured by the assets of the nonprofits. SeniorTrust also acquired a nursing home from another nonprofit by assuming the liability owed to NHC. SeniorTrust and ElderTrust contracted with NHC to manage their nursing homes.

SeniorTrust failed financially and became unable to fulfill its charitable purposes. On November 9, 2011, the Tennessee Attorney General filed suit in chancery court seeking judicial dissolution and appointment of a receiver to wind up and liquidate the affairs of SeniorTrust pursuant to Tenn. Code Ann. §§ 48-64-301 and 303. The trial court found sufficient grounds for dissolution and liquidation of the assets of SeniorTrust and appointed Cumberland & Ohio Co. of Texas as Receiver ("Receiver"). In its order, the trial court stated that the purpose of the receivership was "to maintain, collect and recover charitable assets of SeniorTrust and to conserve and preserve those assets as well as all other charitable assets of SeniorTrust for the benefit of the State and its citizens." The order directed the Receiver to "recover, collect, operate, maintain, preserve and manage the Assets in the best interests of the State and its citizens."

On September 5, 2012, the Attorney General filed an action in the chancery court seeking judicial dissolution and appointment of a receiver to wind up and liquidate the affairs of ElderTrust, which had also become unable to fulfill its charitable purposes due to its financial condition. The trial court found sufficient grounds for the dissolution of ElderTrust and for the liquidation of its assets and appointed Cumberland & Ohio Co. of Texas as Receiver. This receivership action was consolidated with the SeniorTrust receivership action on October 26, 2012.

After an investigation of the two nonprofit corporations and their relationships with NHI and NHC, the Receiver, with the approval of the Attorney General, filed suit

against NHI and NHC seeking damages and other remedies for certain allegedly improper actions. The Receiver alleged, in part, that NHI and NHC formed the two nonprofits for their private benefit, not for public purposes, and that they had significantly overcharged the nonprofits.

The Receiver, the Attorney General, and NHI and NHC entered into a settlement agreement in April 2013. The agreement provided that all of the nursing homes owned by SeniorTrust and ElderTrust would be sold; the proceeds from those sales as well as certain funds on deposit with the trial court and agreed payments from NHC and NHI would be deposited with the Receiver. The agreement further provided, in pertinent part:

> Upon the conclusion of the dissolution of the receiverships of SeniorTrust and ElderTrust the funds of SeniorTrust and ElderTrust remaining after payments of all receivership fees, costs, and approved claims will be distributed to one or more Tennessee public benefit nonprofit organizations as *recommended by the OTAG [Office of the Attorney General] and approved by the Chancery Court* for the State of Tennessee, 20th Judicial District. Before that recommendation is made, the OTAG will meet with representatives of NHI and NHC concerning such recommendations.

(Emphasis added).

The trial court approved the settlement agreement in an agreed order entered on May 3, 2013. The trial court found that the agreement achieved the purposes of the receivership by resolving all outstanding disputes between the parties and allowing the Receiver to wind up the parties' affairs. The court further stated that the Receiver and the Attorney General "will then be able, subject to input from the public, to make recommendations to the Court for the distribution of the nonprofits' remaining charitable assets for the benefit of the citizens of the State of Tennessee." There was no appeal from this order.

In an April 2013 press release, the Attorney General announced that the parties had reached a settlement and stated:

> The Office of the Tennessee Attorney General, which oversees Tennessee nonprofits, expressed satisfaction with the settlement of these disputes, which is subject to approval by the court in which the receiverships are pending. "We believe this settlement is in the best interest of the public and upholds the appropriate use of Tennessee charities[,]" said Attorney General Bob Cooper. *"The Court will ultimately determine how these funds can be used for charitable purposes, and the Office of the Attorney*

3

*General will seek and welcome public input in that process."*

(Emphasis added). In a letter dated December 4, 2013, the Attorney General explained that his office was "in the process of developing a proposed plan for distribution of [the settlement proceeds] for recommendation to and approval by the Davidson County Chancery Court." The Attorney General sought input from the Tennessee Commission on Aging and Disability and asked for a proposal for the use of the settlement funds.

The Attorney General ultimately received twenty-six proposals from nonprofit organizations seeking some portion of the settlement funds. Because the Attorney General determined that his office lacked the expertise to review and evaluate these proposals and that he needed expert assistance to develop a recommendation for the use of these charitable assets, the Attorney General retained an expert consultant, Katherine Pearson Criss. Ms. Criss had over twenty years of experience in community and private foundation executive leadership roles, including serving as the Founding Executive Director of the East Tennessee Foundation in Knoxville and as the Ford Foundation's Representative in East Africa. Ms. Criss was semi-retired and not currently employed by any nonprofit organization.

As expert consultant, Ms. Criss was charged with identifying and recommending appropriate charitable purposes for the assets and methods of distribution to achieve those purposes. Along with representatives from the Attorney General's office, Ms. Criss initially met with all of the principal players: the Receiver and the Receiver's counsel, the mediator, and representatives of NHI and NHC. She then conducted a series of meetings with nonprofit, community, and government leaders across the State, including Governor Bill Haslam and former Governor Phil Bredesen.[1] In January 2014, Ms. Criss held a focus group meeting in Knoxville with nonprofit leaders in east Tennessee. In April 2014, Ms. Criss and a representative of the Attorney General's office attended the 2014 Tennessee Foundations Health Summit in Nashville, sponsored by the Governor's Foundation for Health and Wellness and BlueCross BlueShield of Tennessee Foundation. In May 2014, Ms. Criss, the Attorney General, and other representatives from the Attorney General's office held a focus group meeting with nonprofit leaders from across the State.

On July 11, 2014, the Attorney General submitted to the trial court a proposed

_____

[1]Ms. Criss met with representatives of the following organizations (among others): the Governor's Foundation for Health and Wellness, the Frist Foundation, the Plough Foundation, the Community Foundation of Greater Memphis, the Community Foundation of Middle Tennessee, the Center for Nonprofit Management, the Eastman Chemical Company Foundation, Conexion Americas, the Cornerstone Foundation of Knoxville, the Hyde Foundation, the Tennessee Board of Regents, the Trinity Health Foundation of East Tennessee, the Lyndhurst Foundation, and the East Tennessee Foundation.

plan for the distribution of the remaining assets of the receivership entities. The three main recommendations of the plan were as follows:

1. Distribution of $3 million to establish a charitable fund for the benefit of residents of Rutherford County. The fund would be affiliated with the Community Foundation of Middle Tennessee.
2. Distribution of $2.1 million to conduct a three-year statewide educational campaign, "The Tennessee Nonprofit Governance Campaign," to promote best practices in the governance of nonprofit organizations. The campaign would be organized by the Nashville-based Center for Nonprofit Management.
3. Distribution of the remaining assets, approximately $35 million, to create a new state-wide foundation, the "Foundation for a Greater Tennessee," to develop and review the proposals received by the Attorney General and other projects that would promote improvements in the health and livability of Tennessee's communities.

On July 17, 2014, the trial court entered a memorandum and order in response to the Attorney General's request to set the case for a hearing to present his proposed plan to the court. The trial court noted that, between the fall 2013 settlement and the July 2014 filing of the proposed plan, there had been no reports or status conferences to inform the court of the direction the Attorney General was taking in formulating a proposed plan for distribution of the funds. Thus, the court stated, "the Court has never had the opportunity to assure and establish that the applicable parameters of the law are being adhered to in formulating a distribution proposal." The court noted that its primary concern was with recommendation number three, spending $35 million to start a new foundation, which raised questions of redundancy.

Before setting the case for a hearing, the court wanted the Attorney General to answer four preliminary questions:

1. An explanation of why it is rational to create a new Foundation instead of distributing the remaining assets of the Nonprofits to an existing Foundation . . . to funnel the money more quickly to those persons and causes who need it, and to preclude the money from being used for redundant start-up and organizational costs.
2. Whether any of these meetings and telephone conversations were with or to the Executive/Governor's Branch to try to use an existing Foundation or existing Foundations to avoid the cost and delay of redundancy.
3. State the standard applied by OTAG for disposition of the funds with

5

citation to supporting legal authority.

4. Was the Tennessee Commission on Aging and Disability consulted about disposition of the Funds.

On July 23, 2014, the Attorney General filed a response supported by the affidavits of Ms. Criss and Laurens Tullock. Mr. Tullock was the President of the Cornerstone Foundation of Knoxville and had volunteered to serve without compensation as incorporator and as a director on the initial board of directors of the new foundation proposed by the Attorney General.

On July 30, 2014, the West End Home Foundation, Inc. ("West End"), a nonprofit corporation, sought to intervene in the case on the basis that it had an interest "in seeing that the elderly population of Tennessee receive the benefit of this money." West End was one of the twenty-six nonprofits that had submitted a proposal to the Attorney General for use of the funds.

In a memorandum and order entered on September 17, 2014, the trial court withheld approval of the plan. The court stated that the Attorney General's answers to the court's questions failed to convince the court that its concerns were unfounded and that the petition submitted by West End raised additional concerns about the Attorney General's process "as not transparent, unresponsive, and misfocused." The trial court, therefore, stayed distribution of the $40.1 million in funds of the nonprofits' charitable assets until further order and withheld approval of the Attorney General's proposed plan until further order. The trial court stated that it intended to:

> [F]urther investigate and evaluate whether modifications of OTAG's Plan are needed and to obtain further information related to the Court's concerns about (1) the redundancy, costs and delays to charitable recipients of receipt of the Funds if OTAG's proposal to start a new Foundation is implemented and (2) that OTAG's Plan does not focus on benefitting the elderly.

The trial court went on to appoint West End and the Legal Aid Society of Middle Tennessee and the Cumberlands ("Legal Aid") as amici curiae. The matter was set for a hearing on October 1, 2014. The Tennessee Commission on Aging was to have a representative at the hearing to provide information about potential custodians of the funds.[2]

The day after the October 1, 2014 hearing, the trial court entered a memorandum

---

[2]The trial court subsequently granted the motion of Senior Citizens, Inc. d/b/a FiftyForward ("FiftyForward") to participate as an amicus curiae.

and order disapproving the Attorney General's proposed plan on three grounds:

1. <u>Not Focused On The Elderly</u>—The *Plan* does not distribute the Funds to organizations which carry on and serve the charitable purposes of the dissolved nonprofit corporations:  serving the elderly.
2. <u>Inefficient</u>—Use of $35 million of the Funds to create a new charitable foundation to identify organizations and then to distribute the Funds is inefficient, redundant and will delay distribution to charitable recipients, as there already exist organizations and resources to do this.
3. <u>Closed Process</u>—In this matter of public interest, OTAG stated, "The Court will ultimately determine how these funds can be used for charitable purposes, and the Office of the Attorney General will seek and welcome public input in that process," setting the expectation that the nonprofit community would be included by notice and a transparent process, but that did not occur.

The trial court certified this order as a final order pursuant to Tenn. R. Civ. P. 54.02.

The Attorney General filed a motion to alter or amend, requesting that the trial court withdraw the Rule 54.02 certification to allow the Attorney General a brief period of time to submit a revised proposal addressing the court's concerns.  The trial court denied this motion on November 5, 2014.  The Attorney General appeals.

ANALYSIS

The issue on appeal is whether the trial court erred in disapproving the Attorney General's proposed plan for distribution of the remaining assets of the liquidated nonprofit corporations.  In order to resolve this issue, we must address several questions, including the appropriate standard of review.

Standard of review

Part of the Tennessee Nonprofit Corporation Act ("TNCA"), codified at Tenn. Code Ann. §§ 48-51-101–48-68-105, governs judicial dissolution, the procedure used by the Attorney General in this case.  *See* Tenn. Code Ann. §§ 48-64-301–48-64-304.  The Attorney General asserts that the TNCA vests him with "wide discretion and broad powers" to regulate public benefit corporations for the public good.  He further argues: "Given the wide latitude granted the Attorney General by the Tennessee General Assembly in this field, any decision made by the Attorney General in the exercise of these statutory duties is reviewed by a court under the 'abuse of discretion' standard."

7

We agree with the Attorney General that the TNCA vests him with wide discretion to regulate nonprofit corporations and to make sure they act for the public good. We do not, however, agree that the Attorney General's broad discretion necessarily results in judicial review under the deferential abuse of discretion standard. Moreover, the cases cited by the Attorney General to support his argument for the abuse of discretion standard of review do not involve proposed plans for the use of funds remaining after a judicial dissolution.

In *Summers v. Cherokee Children & Family Services, Inc.*, 112 S.W.3d 486, 506-07 (Tenn. Ct. App. 2002), the court discussed the TNCA, the Revised Model Nonprofit Corporation Act (upon which the TNCA was based), and the role of the Attorney General. The court's description of the Attorney General's role includes the following statements:

> "[T]he Revised [Model Nonprofit Corporation Act] provides standing to the attorney general to protect the public interest." [Lizbeth A. Moody, *The Who, What, and How of the Revised Model Nonprofit Corporation Act*, 16 N. KY. L. REV. 251, 262-63 (1988)].

> The drafters of the Revised Model Act intended that the Attorney General of the incorporating state have wide discretion and broad powers in regulating public benefit corporations to ensure that they operate as nonprofits.

*Summers*, 112 S.W.3d at 506-07. Thus, the Attorney General's discretion applies to its regulatory power to insure that nonprofits act as nonprofits. *See* Tenn. Code Ann. § 48-64-301(a)(1). The other case cited by the Attorney General, *State ex rel. Adventist Health Care System/Sunbelt Health Care Corp. v. Nashville Memorial Hospital, Inc.*, 914 S.W.2d 903, 909-10 (Tenn. Ct. App. 1995), also contains some broad language concerning the discretion of the Attorney General, but the case involved a nonprofit corporation's voluntary sale of assets, a matter over which the Attorney General clearly has oversight pursuant to Tenn. Code Ann. § 48-62-102(g).

With respect to the distribution of assets from a judicial dissolution, we find no support for the Attorney General's assertion that he has broad discretion. The only relevant statutory provision, Tenn. Code Ann. § 48-64-304(b), states as follows:

> After entering the decree of dissolution, the court *shall direct* the winding up and liquidation of the corporation's assets and affairs in accordance with § 48-64-105 and the notification of claimants in accordance with §§ 48-64-

8

106 and 48-64-107.[3]

(Emphasis added). The language of this provision supports the conclusion that the court is the ultimate decisionmaker with respect to the distribution of a nonprofit's funds, a fact acknowledged by the Attorney General in his press releases and other public documents

---

[3] The statutes cited in Tenn. Code Ann. § 48-64-304(b) are a correct codification of 1987 Tenn. Pub. Acts, Ch. 242, § 14.33, which referred to §§ 14.05, 14.06 and 14.07 respectively. The 1987 Tennessee act is based on the Revised Model Nonprofit Corporation Act of 1987 ("RMNCA"). However, the RMNCA, in § 14.33, refers to §§ 14.06, 14.07 and 14.08. It appears to us that the RMNCA's references make more sense. Arkansas, Indiana, Mississippi, Montana, North Carolina and South Carolina also adopted the RMNCA. Their statutory references are all consistent with those used in § 14.33 of the RMNCA. *See*, Ark. Code Ann. § 4-33-1433; Ind. Code § 23-1-47-4; Miss. Code Ann. § 79-4-14.33; Mont. Code Ann. § 35-2-731; N. C. Gen. Stat. § 55A-14-33; S. C. Code Ann. § 33-31-1433.

We could conclude that the Tennessee General Assembly's deviation from § 14.33 of the RMNCA was a mistake made when the bill was written. While we believe it was an error and clear statutory errors may be corrected in certain limited circumstances, *see Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 5 (Tenn. 1994) ("[I]n the event that the intent of the Legislature conflicts with the language of the statutes, or when the language produces an absurd or incongruous result when applied in specific factual situations, the intent of the Legislature will prevail over the literal language of the statute."); *State v. Temple*, 142 Tenn. 466, 220 S.W. 1084, 1086 (1920) (Treating an omission in a statute "as an oversight or a clerical error" and supplying a word so as to "harmonize" two statutory provisions.); *Igou v. Vanderbilt Univ.*, No. M2013-02837-COA-R3-CV, 2015 WL 1517794, at *6 (Tenn. Ct. App. Mar. 27 2015) ("Where we are confronted with an apparent error on the face of a statutory provision, we may refer to other parts of the statute in seeking its correction."), "[c]ourts may neither alter or amend statutes nor substitute our own policy judgments for those of the General Assembly." *Britt v. Dyer's Emp't Agency, Inc.*, 396 S.W.3d 519, 523 (Tenn. 2013). *See also U. S. Bank, N. A. v. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 393 (Tenn. 2009) ("courts 'cannot, of course, under the guise of construction amend or alter'" statutes) (*quoting McBrayer v. Dixie Mercerizing Co.*, 144 S.W.2d 764, 768 (Tenn. 1940)); *City of Knoxville v. Entm't Res., LLC*, 166 S.W.3d 650, 658 (Tenn. 2005) ("[I]t is the prerogative of the legislature, and not the courts, to amend statutes.'") (*quoting In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999)). We note that § 48-64-304(b) has not been changed since its enactment in 1987—twenty-eight and one-half years ago—despite changes having been made to many other parts of the TNCA as recently as last year. *See* 2014 Tenn. Pub. Acts Ch. 899 (incorporating certain provisions of the 3rd edition of the RMNCA in the TNCA). Given this and the fact the issue has not been raised by the parties, we leave this matter for the General Assembly to address. Consequently, we address Tenn. Code Ann. § 48-64-304(b) as written and as argued by the parties.

describing the process of developing a proposed plan and presenting it to the court for approval.

In light of the broad statutory powers given to the chancery court with regard to winding up and liquidating a nonprofit corporation's assets after a judicial dissolution, we find that the appropriate standard of review of the trial court's decision is the abuse of discretion standard. Under the deferential abuse of discretion standard, we must review a trial court's discretionary decision to determine:

> (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); *see also Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Serv. Constr. Co., Inc.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988)).

<u>Rejection of proposed plan</u>

The trial court gave three reasons for its decision to reject the Attorney General's proposed plan for distribution of the remaining assets of SeniorTrust and ElderTrust. We will examine each of the reasons in turn.

(1)

The first reason given by the trial court is that "it does not distribute the Funds to organizations which carry on and serve the charitable purposes of the dissolved nonprofit corporations: serving the elderly." The trial court went on to conclude that "Tennessee law, at a minimum, prefers, and perhaps even requires in this case, the Funds be used for a charitable purpose substantially similar to their originating charitable purpose: serving the elderly." The Attorney General disagrees with this interpretation of the law and asserts that it was within his discretion to distribute the funds to any organization "organized and operated exclusively for public charitable purposes as shall at the time qualify as exempt from taxation under Section 501(c)(3) of the Internal Revenue Code."

The judicial dissolution provisions of the TNCA do not address how the funds

10

must be used.[4]  All parties rely upon the charter of the two nonprofit corporations to make their arguments concerning the appropriate use of the funds.  Article thirteen of the charter of both nonprofits concerns dissolution of the corporation and states:

> Upon dissolution of the corporation, the Board of Directors shall, after paying or making provision for payment of all of the liabilities of the corporation, dispose of all of the assets of the corporation by distributing those assets exclusively for the purposes of the corporation in such manner or to such organization or organizations organized and operated exclusively for public charitable uses and purposes as shall at the time qualify as exempt from taxation under Section 501(c)(3) of the Internal Revenue Code and as other than a private foundation under Section 509(a) of the Internal Revenue Code, as the Board of Directors shall determine.  *Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction* for the county in which the principal office of the corporation is then located, *exclusively for such purposes or to such organizations or organizations as said court shall determine*, which are organized and operated exclusively for such purposes.

(Emphasis added).  Because the situation at issue here involves judicial dissolution, the last sentence of article thirteen is the relevant language here.  That sentence contains the key language "for such purposes or to such organizations or organizations as said court shall determine," which is an indication that the court has the discretion to choose whether the funds will carry on the specific purpose of the original nonprofit or will go to broader charitable purposes.

There is evidence in the record to support a finding that the needs of seniors in Tennessee are not met.  The Director of the Tennessee Commission on Aging and Disability stated, in his presentation to the trial court, that the needs of seniors were not being met by current funding sources and that Tennessee ranked very low in indicators of health and well-being for seniors.  The trial court also made the following statement regarding its reasoning for limiting the use of funds to seniors:

> [L]imiting distribution of the Funds to recipients similarly situated to those designated in the Articles of Incorporation of the dissolved nonprofits is good policy.  One of the motivations, OTAG claimed, for setting up a new foundation was because it could not handle and process the volume and breadth of organizations applying for the Funds.  If, however, distribution

---

[4]This statement is, of course, based on applying Tenn. Code Ann. § 48-64-304(b) as written, not as we might correct it.  *See* footnote 3.

11

of the Funds is more narrowly and specifically focused to the elderly and services to them, distribution of the Funds is manageable by OTAG and the Court.

We have concluded that the trial court did not abuse its discretion in rejecting the proposed plan on the basis that the funds were not being used for seniors. There is a factual basis in the record to support the trial court's decision, and it is consistent with applicable legal principles and within the range of acceptable alternative dispositions.[5]

(2)

The second reason given by the trial court for rejecting the proposed plan is that the creation of a new charitable foundation "to identify organizations and then to distribute the Funds is inefficient, redundant and will delay distribution to charitable recipients, as there already [exist] organizations and resources to do this." As the basis for this reason, the trial court cited common sense and the facts developed by the amici curiae.

The Attorney General's plan contemplates that the bulk of the remaining funds of the nonprofits ($35 million out of a total of $40 million) will be distributed to a new foundation; the plan provides that the new foundation will "craft a process for selecting recipients of the Funds, select those recipients and distribute the Funds." The trial court observed that the proposal describes the "administrative and other start-up tasks attendant to creating a foundation from the ground up."

At the hearing on October 1, 2014, the trial court heard from the Director of the Tennessee Commission on Aging and Disability as well as the amici curiae. Based upon this testimony, the filings of the amici curiae, and the proposals of the 26 nonprofits sent to the Attorney General before he submitted his proposed plan, the trial court concluded that "organizations and entities already exist to immediately distribute and/or receive and use the charitable funds." The trial court stated that, under the proposed plan, "money that could go directly to charitable entities and recipients will be spent and delayed in creating a new Foundation."

We find no abuse of discretion in the trial court's rejection of the Attorney General's recommendation to create a new foundation with the bulk of the nonprofits'

---

[5] We note that if we judicially corrected Tenn. Code Ann. § 48-64-304(b), the same result would be reached by applying Tenn. Code Ann. § 48-64-106(a)(5), which permits "[t]ransfering, subject to any contractual or legal requirement, the assets as provided in or authorized by its charter or bylaws."

remaining funds. This reasoning is supported by facts in the record and is within the range of acceptable dispositions.

(3)

The third and final reason given by the trial court for rejecting the Attorney General's proposal is that, after setting up the expectation that he would seek public input and use a transparent process, the Attorney General failed to do so.

The issue here is not, as argued by the Attorney General, whether he was required by law to use a certain type of process. As the trial court stated, the Attorney General "volunteered and represented to the public that its [the public's] involvement was an essential element of the process." The trial court cited the following facts:

> First, in the Agreed Order approving the Settlement Agreement in these cases, OTAG stated that any recommendations on the distribution to the Court would be "subject to input from the public":
>
>> The Receiver and the OTAG will then be able, *subject to input from the public*, to make recommendations to the Court for the distribution on the nonprofits' remaining charitable assets for the benefit of the citizens of the State of Tennessee.
>
> Second, in an April 26, 2013 News Release, OTAG announced that a settlement had been reached in these cases and stated that it would include public "input" in the process:
>
>> The Office of the Tennessee Attorney General, which oversees Tennessee nonprofits, expressed satisfaction with the settlement of these disputes, which is subject to approval by the court in which the receiverships are pending. "We believe this settlement is in the best interest of the public and upholds the appropriate use of Tennessee charities," said Attorney General Bob Cooper. "The Court will ultimately determine how these funds can be used for charitable purposes, and *the Office of the Attorney General will seek and welcome public input in that process.*"
>
> Following the submission of the Plan, at least two other nonprofit organizations petitioned the Court, arguing the process for public input was not meaningful, open, transparent, or publicized. Specifically, Amici

13

Curiae West End Home Foundation, Inc. and Senior Citizens, Inc. d/b/a FiftyForward filed papers with the Court, seeking intervention in these cases, in part, based upon the fact that they were unaware/not considered in submitting proposals for distribution of the funds . . . .

(Emphasis added).

Having established that the Attorney General set up an expectation of an open process inviting public input, the trial court went on to discuss the shortcomings of the actual process employed by the Attorney General. The trial court stated that the process used by the Attorney General was "simply inefficient," and gave the following support:

A. It was not open. In the case of the West End Home, it was not allowed to participate despite assurances to the contrary. . . . This process should have been an all-inclusive process, not a closed one.
B. It was not well publicized. It is striking that only twenty six (26) proposals were made for any part of the Funds. There are approximately 12,000 nonprofit organizations registered with the Tennessee Secretary of State's office; there are known to be many more who are not registered. . . . This speaks to the lack of publicity about the availability of the Funds and the paucity of contacts with existing nonprofit organizations in Tennessee. The West End Home only learned of the availability of the Funds indirectly, from one of its directors who overheard a discussion about the Funds.
C. It was not thoughtful. Though only twenty six (26) proposals were submitted, the OTAG apparently discarded all of them[.] In the proposed Plan . . . , the OTAG writes that:
> This Office lacks the resources and expertise to review and evaluate the proposals.

So, apparently the OTAG didn't even consider these proposals. This stands in stark contrast with the earlier part of the Proposed Plan, where the OTAG described over some three (3) pages (pages 6-8) the expertise of their expert, Ms. Criss. Query: What was accomplished by engaging Ms. Criss.

The trial court went on to point out that the Attorney General devised criteria that a proposal had to meet and a deadline for submission of an organization's proposal, as evidenced by the Attorney General's letter to the Tennessee Commission on Aging and Disability. But, "neither the deadline for submission of proposals nor the initial criteria were publicized." The trial court concluded: "After setting an expectation of public input, OTAG engaged in an unclear, unpublicized proposal process, which was left

14

unresolved upon OTAG's submission of its Plan to this Court. This resulted in the perception of members of the nonprofit community of a closed process."

Once again, we find no abuse of discretion in the trial court's rejection of the proposed plan on this basis.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs of appeal are assessed against the appellant, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE